John A. **PENELLO**, Regional Director of the Fifth Region of the National Labor Relations Board, for and on Behalf of the **NATIONAL LABOR RELATIONS BOARD**

v.

**GLASS BOTTLE BLOWERS ASSOCIATION OF the U. S. AND CANADA, AFL–CIO, LOCAL UNION NO. 56,** Glass Bottle Blowers Association of the U. S. and Canada, AFL–CIO, Local Union No. 33, Glass Bottle Blowers Association of the U. S. and Canada, AFL–CIO, Local Union No. 30, Glass Bottle Blowers Association of the U. S. and Canada, AFL–CIO, Local Union No. 9.

Civ. No. 19203.

United States District Court
D. Maryland.
Feb. 28, 1968.

**644**

Charles B. Slaughter and David L. Murphy, Attys., National Labor Relations Board, Region 5, Baltimore, Md.

(Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Julius G. Serot, Asst. Gen. Counsel, Washington, D. C., and David C. Sachs, Regional Atty., Region 5, Baltimore, Md., on the brief), for petitioner.

Bernard W. Rubenstein, Baltimore, Md. (Jacob J. Edelman and Edelman, Levin, Levy & Rubenstein, Baltimore, Md., on the brief), for respondents.

Richard C. Hotvedt, Washington, D. C., for Maryland Warehouse and Storage Co., complaining party.

THOMSEN, Chief Judge.

In this proceeding under sec. 10(*l*) of the National Labor Relations Act, as amended [1] (the Act), the Regional Director of the Fifth Region of the National Labor Relations Board (the Board) seeks a temporary injunction against respondents, Local Unions Nos. 56, 33, 30 and 9 of Glass Bottle Blowers Association of the U. S. and Canada, AFL–CIO, pending the final disposition by the Board of a charge filed by The Maryland Warehouse and Storage Company (Maryland Warehouse), alleging that respondents have engaged in and are engaging in unfair labor practices within the meaning of sec. 8(b) (4) (i) (ii) (B) of the Act, which proscribes so-called secondary boycotts and other secondary pressures to require another employee or person to cease doing business with any other person.

The petition filed herein is based on petitioner's conclusion that there is reasonable cause to believe that respondents have engaged in the unfair labor practices charged and that a complaint of the Board based on that charge should issue. The injunctive relief prayed is interlocutory to the final determination of the charge pending before the Board. The Court must decide, from the evidence taken in this proceeding, whether petitioner had reasonable cause to believe that there had been such a violation and whether the injunctive relief requested is just and proper.

I. Sept. 14, 1959, 73 Stat. 544; 29 U.S.C.A. § 160(*l*).

## Facts [2]

Maryland Warehouse operates in Baltimore two public warehouses adjacent to each other, where it receives for storage and transshipment the goods and products of over 100 commercial and manufacturing concerns. In the ordinary course of its business, Maryland Warehouse has for several years received at those warehouses cartons of glass containers from Owens-Illinois, shipped from outside Maryland via common carrier, and during the past year has received similar products from Maryland Glass Corporation. Neither Owens-Illinois nor Maryland Glass has any financial interest in Maryland Warehouse or in any company affiliated with Maryland Warehouse. They have no common officers or directors. Maryland Warehouse issues nonnegotiable warehouse receipts for such merchandise, sometimes to the bottle manufacturer and sometimes to a customer of the manufacturer, e. g. Seagrams, which has purchased the bottles or other glass containers.

The containers so received by Maryland Warehouse are custom made by Owens-Illinois and Maryland Glass for their respective customers. They are placed empty by the manufacturer in cardboard cartons containing the names and brand identifications of the purchasers. The name Maryland Glass never appears on the cartons received from it and the name Owens-Illinois appears only as a two-inch imprint on the bottom of the unsealed cartons received from it. When the cartons are transshipped from Maryland Warehouse, the customer will use the same cartons to reship the filled glass containers to their wholesale and retail outlets.

Maryland Warehouse delivers to a common carrier the cartons owned by Owens-Illinois or Maryland Glass, sometimes on order of the manufacturer and sometimes on order of the customer; it delivers to a common carrier the cartons owned by a customer on order of the customer. In the course of such deliveries the employees of Maryland Warehouse handle the stored merchandise, taking it to the delivery platforms and sometimes loading it onto freight cars or trucks.

No employees of Maryland Glass or Owens-Illinois perform any services at Maryland Warehouse; they come to the warehouse only on rare occasions. No customers either of Maryland Glass or Owens-Illinois, nor wholesalers or retailers who purchase from such customers, ever have occasion to visit the warehouse.

The two warehouses of Maryland Warehouse are located on Wilmarco Avenue, a short dead-end street two blocks south of Wilkens Avenue in southwest Baltimore, on the site of an old stockyard. It is not a place frequented by the public.

Respondents have no labor dispute with Maryland Warehouse and do not represent any employees of Maryland Warehouse. Since on or about December 31, 1967, however, respondents and other local unions have been engaged in a labor dispute with and strike against Owens-Illinois, Maryland Glass and other bottle manufacturers over the terms and conditions of their collective bargaining agreement. In furtherance of that dispute, on or about February 5, 1968, three men, acting on behalf of all respondents, visited Maryland Warehouse, asked the secretary if its president was shipping glass, said that they had assurances from several warehouses that such warehouses would not ship glass containers, and stated that respondents would like to be assured that Maryland Warehouse would not ship any glass containers, so that they would not have to put up a picket line around its warehouses. The representatives were referred to the manager of the warehouses and to the director of industrial relations of Maryland Warehouse and its affiliated companies; those men did not give respondents the desired assurance. Respondents' emissaries also inquired if the employees of Maryland Warehouse were represented by a union. Upon receiving an affirmative answer,

---

2. Formal findings of fact have been made and filed. Many of them are not disputed.

the spokesman for respondents replied, "Good. That makes it better"—or "easier".

On February 6 two pickets appeared outside Maryland Warehouse carrying signs bearing the legend:

"GBBA
Locals 33 and 56
ON STRIKE
For Economic Justice
Glass Bottle Blowers Association,
AFL-CIO"

These signs had been used by pickets at the Maryland Glass plant. The pickets walked along the public street in front of the platforms where motor carriers park to load and unload. The picketing still continues. On or before February 9 the signs were changed to read:

"GBBA
Locals 9–33–30–56
ON STRIKE
against Owens-Illinois, Anchor Hocking,
Knox [3] and Maryland Glass
Corporation
FOR ECONOMIC JUSTICE

Please do not use the products of the above companies while we are on strike. Thank you. Glass Bottle Blowers Association, AFL–CIO."

The pickets and their signs appeal to the employees of Maryland Warehouse to refrain from performing part of their work for Maryland Warehouse in order to prevent the shipment of the glass containers from the warehouse to customers of the struck manufacturers. They also appeal to the employees of the carriers not to pick up and deliver such merchandise from the platforms of Maryland Warehouse.[4] The picketing has already caused some slight injury to Maryland Warehouse and is likely to cause some injury in the future.[5]

An object of respondents' conduct was and is to force or require Maryland Warehouse and the carriers to cease storing, delivering, transporting or otherwise handling the products of and to cease doing business with Owens-Illinois and Maryland Glass. It may fairly be anticipated that, unless enjoined, respondents will continue and repeat the acts and conduct set out above or similar acts and conduct.

*Discussion*

Sec. 8(b) (4) (i) (ii) (B) of the Act makes it an unfair labor practice for a labor organization or its agents to engage in, or to induce or encourage any individual employed by any person engaged in commerce to engage in, a strike or a refusal in the course of his employment to use, or otherwise *handle* or work on any goods or to perform any services, or to threaten, coerce, or restrain any person engaged in commerce, where in either case an object thereof is "forcing or requiring any person to cease using, selling, *handling*, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease *doing business* with any other person * * *." (Italics supplied.)

In McLeod for and on Behalf of N. L. R. B. v. *United Auto Workers of America, Local 365*, 200 F.Supp. 778 (E.D.N.Y.

---

3. Neither Anchor Hocking nor Knox ship any products through Maryland Warehouse.

4. During the strike there have been no shipments to the warehouse by the struck companies and there probably will be no such shipments, although sometimes there is movement from one warehouse to another.

5. On or about February 6, the driver of the one truck operated by Maryland Warehouse was hesitant about crossing the picket line to deliver some cans, and it was necessary for his supervisor to confer outside the warehouse with the picket captain and afterward with an officer of one of respondents before he could obtain assurance that the driver might deliver the cans without trouble. Seagrams, one of the customers of Maryland Glass, has refrained, because of the picket line, from calling for delivery of any of its bottles stored at Maryland Warehouse. This has resulted in unprofitable dead storage and may, within the next week or so, prevent Maryland Warehouse from accepting more profitable business.

1962), aff'd 299 F.2d 654 (2 Cir., 1962), the facts were much like the facts in this case. Judge Bartels said:

"The Court believes that this type of activity is within the purview of the Act even though the secondary employer has suffered little or no damage. It is sufficient if the unoffending secondary employer is subject to pressures in a controversy not its own. N. L. R. B. v. Denver Bldg. & Const. Tr. C., 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; see also Teamsters Local 135, 1955, 114 N.L.R.B. 639, and 105 Cong.Rec. 16254–55, September 2, 1959; Legis.Hist. 1388. Moreover, the action of respondent herein has interfered with the contractual duty of Eagle to redeliver the goods to its bailor. Local 135, International Brotherhood of Teamsters, 1960, 126 N.L.R.B. 251; see also Retail Fruit & Vegetable Clerks Union, etc. v. N. L. R. B., 9 Cir., 1957, 249 F.2d 591.

"*   *   *

"Lastly, this is not a situs situation within the purview of the Moore Dry Dock Case (Sailors' Union of the Pacific, 1950, 92 N.L.R.B. 547) or Seafarers International Union, etc. v. N. L. R. B., supra, because there is no sharing of a common situs by Intertype and Eagle. Intertype has a permanent place of business which is being effectively picketed and one of the objectives of the picketing against Eagle is pressure upon the secondary employer. Under the circumstances the situs of the nine (9) finished machines crated and stored for shipment in a neutral warehouse cannot be considered as a partial situs of this labor dispute. Neither by the situs test nor by the nature of work test is this boycott justified. *   *   *." 200 F.Supp. at 781.

Respondents do not deny that the instant case comes within the principles applied in McLeod v. United Auto Workers and other cases granting relief, but contend that respondents' picketing "falls within the framework" of N. L. R. B. v. Fruit and Vegetable Packers and Warehousemen Local 760, 377 U.S. 58, 84 S.Ct.

1063, 12 L.Ed.2d 129 (1964), (usually called the Tree Fruits case). In that case the union was striking against certain fruit packers doing business in Yakima, Washington. The struck firm sold apples to the Safeway chain of retail stores in and about Seattle. The union instituted a consumer boycott against the apples in support of the strike by causing pickets to walk back and forth before the customer entrances of 46 Safeway stores in Seattle and by urging the customers of the Safeway stores not to buy Washington State apples. The Supreme Court held that "when consumer picketing is employed only to persuade customers not to buy the struck product, the union's appeal is closely confined to the primary dispute. The site of the appeal is expanded to include the premises of the secondary employer but if the appeal succeeds, the secondary employer's purchases from the struck firms are decreased only because the public has diminished its purchases of the struck product." 377 U.S. at 72, 84 S.Ct. at 1071.

It should be noted that the picketing in the Tree Fruits case was informational picketing, directed at the ultimate consumer. On the other hand, in the instant case, respondents concede that the picketing is not informational picketing. Respondents state that their picketing is "product picketing". They argue: "Although the site of the picketing was the premises of the secondary employer, the intent and purpose of the picketing was to urge such companies as Seagrams from using the glass bottles of the struck company". Respondents' argument is not supported by the facts or the applicable law. Respondents concede that they could not picket Seagrams directly at Seagrams' plant, and they have no greater right to do so indirectly at Maryland Warehouse. Even if they had, the evidence shows that neither the general public nor the employees of Seagrams or other purchasers of the containers frequent the dead-end street where the pickets march in front of the platform of Maryland Warehouse. The court has found

as a fact that the picketing was directed at the employees of Maryland Warehouse and the employees of the common carriers, to persuade them not to handle the containers.

 Sec. 8(b) (4) prohibits every form of influence and persuasion of employees, including picketing, for any of the proscribed objectives. International Brotherhood of Electrical Workers Local 501 v. N. L. R. B., 341 U.S. 694, at pp. 701–702, 71 S.Ct. 954, 95 L.Ed. 1299 (1951). "The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word." Hughes v. Superior Court of State of Cal., etc., 339 U.S. 460, 465, 70 S.Ct. 718, 721, 94 L.Ed. 985 (1950). Picketing "has far more potential for inducing action or nonaction than the message the pickets convey." Building Service Employees etc., v. Gazzam, 339 U.S. 532, 537, 70 S.Ct. 784 (1950). See also International Brotherhood of Teamsters Local 695, A. F. L. v. Vogt, Inc., 354 U.S. 284, 289, 77 S.Ct. 1166, 1 L.Ed.2d 1347, reh. denied 354 U.S. 945, 77 S.Ct. 1423, 1 L.Ed.2d 1558 (1957). So, the change in the legend on the picket signs, now purportedly addressed to consumers rather than to employees, does not make the picketing lawful. Nor does the fact that the warehouse employees overcame the traditional reluctance of workers to cross a picket line. Picketing for an object proscribed by sec. 8(b) (4) is unlawful whether or not its appeal successfully induces a work stoppage. N. L. R. B. v. Denver Building & Construction Trades Council, 193 F.2d 421, 424 (10 Cir., 1952); N. L. R. B. v. Associated Musicians, 226 F.2d 900, 904–905 (2 Cir., 1955); Superior Derrick Corp. v. N. L. R. B., 273 F.2d 891, 895–896 (5 Cir., 1960), cert. den. sub nom. Seafarers, etc. Union etc., v. N. L. R. B., 364 U.S. 816, 81 S.Ct. 47, 5 L.Ed.2d 47 (1960); N. L. R. B. v. Laundry, Linen Supply & Dry Cleaning Drivers, 262 F.2d 617, 620 (9 Cir., 1958).

 The court finds and holds that there is and petitioner had reasonable cause to believe that respondents have engaged in and are engaging in conduct in violation of the Act, and that a temporary injunction should be issued pursuant to sec. 10(l) of the Act.[6]

---

6. Formal conclusions of law have been made and filed.