Bernard L. ALPERT, Regional
Director, Etc.

v.

UNITED STEELWORKERS OF AMER-
ICA, AFL–CIO, Etc.

Civ. A. No. 56–403.

United States District Court
D. Massachusetts.

May 17, 1956.

Stephen M. Reynolds, Washington, D. C., for National Labor Relations Board.

Sidney S. Grant, Boston, Mass., for respondents.

## WYZANSKI, District Judge.

The Court has decided that it is in the interest of justice to dictate forthwith its oral opinion upon the petition for injunction under Section 10(l) of the National Labor Relations Act, 29 U.S.C.A. §§ 151 et seq., 160(l). In general, Congress has directed prompt dispatch of business under this Act. And there is the further consideration that the particular type of matter here brought to the Court ought to be rapidly handled since either the issuance of an injunction or the failure to issue an injunction has immediate and rather drastic consequences in a fluid economic situation. There is in this particular case an additional reason for prompt action because, as it will later appear, there are differences of opinion in Courts of Appeal which suggest that no inferior District Judge will be able to lay down the law in any way that both parties will regard as satisfactory; hence, the channel should be prepared for immediate appeal.

This case began, as has already been indicated, with a petition for injunction filed by the Regional Director of the First Region of the National Labor Relations Board. This petition, filed last Friday, May 11, was scheduled for prompt hearing, and, indeed, a hearing was held today in advance of any filing by the respondent of any written answer, motion, or other document. Due, however, to the cooperative attitude of counsel at a pretrial conducted in the first minutes of today's hearing, many of the matters covered by the petition were conceded for the purposes of this hearing and any appeal therefrom. Thus, it was agreed that the allegations set forth in Paragraphs 2 through 5 of the petition might be taken as true. With respect to the initial part of Paragraph 6 no agreement was made. However, the allegations in subparagraphs 6(a), 6(b), and 6(c) were accepted as true; so much of the allegations of 6(d) as did not involve a concession that there were more than daily reports of the employee (in other words, not three reports each day) were accepted as true; Paragraph 6(e) was accepted as being true up to the words "said premises" which appear on Line 4 of the complaint; none of the allegations set forth in Paragraphs 6(f), 6(g), and 6(h), and none of the allegations in Paragraph 7, were, even for the purposes of this hearing, admitted to be true.

From these concessions it was plain that Barry Controls, Inc., a Massachusetts corporation engaged in manufacture in Watertown, sells products in interstate commerce. Since about July 1955 its production employees and truck drivers employed at the Watertown plant have been represented for purposes of collective bargaining by United Steelworkers of America, AFL–CIO, and Local No. 5246, United Steelworkers of America, AFL–CIO more particularly.

About January 27, 1956, the workers in this unit of production employees and truck drivers engaged in a strike which still continues. About 130 employees are in this unit. At the beginning of the strike there were about two drivers among these 130. These truck drivers drive two trucks for Barry,—one, a larg-

er 2½-ton truck made by International; the other, a small panel Chevrolet truck. The International truck goes in and out making deliveries for Barry perhaps once or twice a day; the Chevrolet goes back and forth half a dozen or more times a day. There are no set times for deliveries.

Among others to whom Barry customarily delivers its products for the purposes of further transport are: Cargo Transportation, Inc., Adley Express Company, and Highway Express Company,—all of whom have facilities in Cambridge, a city that adjoins Watertown and is virtually part of the same area. Barry also delivers products to Horn Bros., Inc., which is not a transportation company but is engaged in the packaging of goods.

So far the parties are not in disagreement on the facts. The questions of fact and of law which divide the parties relate to the conduct of pickets acting at the premises of Cargo, Adley, Highway, and Horn—companies against which Local No. 5246 is not striking and with which it has no labor relations so far as appears. All of these companies are what are sometimes referred to as "secondary employers" not engaged in the primary dispute between Barry and its employees and their representatives.

The thrust of the petition is that the conduct engaged in by the Union is a violation, or may reasonably be believed by the Board to be a violation, of Section 8(b) (4) (A) of the National Labor Relations Act, as amended, sometimes called the Taft-Hartley Act. That section provides:

"(b) It shall be an unfair labor practice for a labor organization or its agents * * *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods * * *

or to perform any services, where an object thereof is:

"(A) forcing or requiring any employer * * * or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person."

The particular proceeding before this Court is filed pursuant to Section 10(l) of the same National Labor Relations Act. The object is to secure a temporary, not a permanent, injunction pending the final adjudication by the Board of a petition which the Board has before it. The petition, filed after preliminary investigation of charges made by Barry Controls, Inc., alleged that the Union and the Local have engaged in unfair labor practices within the meaning of the aforesaid Section 8(b) (4) (A) of the Act. The Board has not yet conducted any hearings on these charges. No Trial Examiner has taken testimony. No report has been filed. No action of the full Board or any panel thereof has occurred, save the authorization of the filing of the petition. The proceeding under Section 10(l) is, in effect, an application to this Court for a protective writ which goes beyond maintaining the status quo but which is in its essence intended to assure that if the Board is virtually certain to prevail on the merits of the case it cannot be thwarted in its effective economic impact by the failure of those alleged to have violated the Act to comply promptly with the mandate of law.

■■ It is unnecessary to refer to the full text of Section 10(l) of the Act. It is quite clear from its language and from the numerous cases that interpret it that it is not prerequisite to the granting of equitable relief by the District Court that a District Court should find that the charges being heard by the Board are true or that in fact a violation of the Act has been committed. Any

final determination of such matters must be made on a record before the Board and by the Board, subject, of course, to review in the Courts of Appeal and ultimately in the Supreme Court of the United States. All these further proceedings are provided for in Section 10 (e) and (f) of the aforesaid Act. But of course it does not follow, and the Board does not suggest that it does follow, that a District Court automatically will grant an injunction upon a petition filed by the Board after charges have been filed with the Board. What a court must do is to appraise the whole situation, exercising the best judgment it can as to what is the general scope of the facts likely to be proved before the Board, what are the issues of law, and how clear it is what rule of law would be and should be applied by the Board.

In this particular case, this Court took evidence from four witnesses offered by the petitioner and then entertained a motion by the defendants that even on the showing made by the petitioner, without taking any evidence from the defendants, the Court should conclude that the petition ought not to be granted. More particularly, the defendants urge this because they had maintained from the beginning, and repeated, that they were thoroughly prepared to stipulate that, pending a final determination by the full National Labor Relations Board of the case now involving Barry and the Union, the Union would abide by the following four conditions:—First, that the Unions and those they represent be limited to picketing at times when Barry's trucks were at the secondary employers' premises (of course without limiting the right of the Unions and the men to picket at the primary employers' premises); second, that any trucks picketed by the Unions and those they represent should be engaged in the normal business of Barry; third, that the picketing in so far as it involved secondary employers should be reasonably near in place to the truck or trucks of Barry; and fourth, that the pickets should clearly show that their disputes were with the primary employer, Barry, the owner of the truck, and not with anyone else.

In approaching the particular issue before me on the motion to deny the petition on the basis of the evidence so far taken, I have especially in mind these relevant considerations which I state before I state what the testimony shows.

First, it is plain that any finding of facts by this Court is not a final finding of the relevant facts in this dispute. Not only have I not heard the defendant's evidence but even if I had heard all the evidence which the Board will subsequently hear directly or through a Trial Examiner, the Board is not required to defer to my view of the facts. In this area the Board speaks as the agent designated by Congress to exercise that special expert quality which experience is thought to develop.

Second, so far as I am informed,—and this point will be illustrated later when I come to the discussion of authorities,—there is no firm statutory language, regulation of the National Labor Relations Board, or clearly established inflexible rule of decision, which states with commanding authority that picketing occurring away from the primary employer's site and at the place of some other employer is, when at the primary employer's site there are adequate facilities for picketing and adequate opportunity for approaching employees, a violation of Section 8(b) (4) (A) of the Act.

Third, so far as my present information goes, no Court has issued in a case like this an injunction at a preliminary stage precisely like this. In any event, even if there were such Court rulings this Court, mindful of the conflicts of legal authority to which reference will be made later, and deferring as it must to the superior authority of Courts of Appeal and acknowledging the special competence of at least some of the Judges who have dealt with this matter, notably Judge Fahy, former counsel of the NLRB and Solicitor General of the United States, and now Judge of the Court of Appeals, whose views expressed in

Sales Drivers, Helpers & Building Construction Drivers, Local Union 859, of International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers v. National Labor Relations Board, D.C. Cir., 229 F.2d 514, indicate an unwillingness to accept the position which counsel for the NLRB expects me to take, must move warily.

Now for the precise facts as I find them on what is admittedly a different record than may be developed ultimately by the NLRB directly or through a Trial Examiner.

The evidence makes it clear that pickets duly authorized to act for the defendants were present when deliveries were being made by Barry's truck at Cargo, Adley, Highway, and Horn. The most remarkable aspect of the testimony is that it indicates that the pickets were never present except when the trucks of Barry were present. Moreover, there is no showing, with the single exception of the testimony offered by Mike Manos of the Highway Express Company, that there were conversations between the pickets and the employees of the secondary employers. It is true that when Mr. Manos *on his own initiative* went to ask the pickets what they were doing at Highway's plant they answered that they had a strike at Barry and asked, in effect, "Are you going to accept our freight?" I assume that there was a conversation roughly of that nature. But it is to be observed that this was a very different attitude than the pickets customarily displayed. All of the testimony indicates that at each of the plants they stayed 25 to 60 feet away from the secondary employers' work places. Indeed, a most remarkable incident occurred at Horn's. Apparently, while the pickets were there the coffee hour occurred. The regular employees of Horn left to take coffee. It was only after all the Horn men had finished that the pickets went over to take coffee. Only one who worked in the Federal Building where there is a coffee hour can understand how rare is this self restraint!

There is no doubt that, with some justification, Barry's truck driver Richard Yorke had occasional apprehension about the pickets. But this case before me does not involve any question of the molestation by pickets of Barry's own employees. Indeed, the very fact that Yorke was becoming apprehensive indicates that his interpretation of the pickets' statements was that they were addressed primarily to him and to Barry's employees and not to the employees of others.

It is true that the picketing badges and signs seemed not to have made each observer fully aware that the pickets were directing their attention to Barry and not to those with whom Barry did business and the employees of those concerns; but the nature of the signs that were carried remains in doubt on the evidence.

From the testimony it is clear that the primary employer, Barry, sent at least some of his truck drivers away for virtually the whole day, and that if they were to be successfully approached it might be, not necessarily is, true that they would have to be approached elsewhere than at the loading platform on the one or two occasions when they might be at Barry's own plant. Furthermore, it is to be borne in mind that here the picketing is addressed, so far as the testimony shows, to drivers by representatives concerned with drivers. However, it must in candor be admitted that the drivers are only a small fraction of the total employees in the unit covered by Barry's for purposes of collective bargaining, that is to say, 2 drivers to roughly 128 persons engaged in production.

In short, we have here picketing not at the situs of the employer's plant but at other places where some of his employees are. But self restraints as to times, distances, and conduct have been imposed by the pickets which colorably limit their direct appeal to the employees of the primary employer. No judge is so naive as to suppose that the color under which the picketing takes place tells

the whole story. Unquestionably one of the other objects of the picketing is to draw the controversy to the attention of the employees at the secondary employers' places of business. All picketing, however, has this indirect, generally intent and secondary effect. Here this indirect appeal is not strident. It does not take the form of coercion. It is merely a subtle and, in form, a secondary appeal for a common enlistment against Barry in a war in which the employees of Cargo, Adley, Highway, and Horn are only indirectly concerned. Perhaps the National Labor Relations Board, the expert in the area, may sometime conclude, and be upheld by the Supreme Court of the United States in proclaiming a general rule, that all picketing away from the primary employer's site is irrebutably presumed to have so clear an ulterior object as to violate Section 8(b) (4) (A). Were such a Procrustean rule to be enunciated, and were it to be held constitutional and not a denial of free speech under the First Amendment to the Constitution, then of course on a record such as is before me a District Court could grant a petition such as is before me.

But that is not the present state of the law. Numerous cases before the Board show that the Board itself has had a wavering attitude not unlike that which most courts have with respect to most doctrines. There has been some development from a rather broad permission to permit picketing at places of business other than the primary employer's to narrower views more characteristic of a later administration; but no one can yet say that the Board itself has adopted an inflexible position that there is an irrebutable presumption that picketing away from the primary employer's place of business is prohibited save in the exceptional case where there is no place at the primary employer's enterprise where such picketing could occur. The earlier cases, such as Moore Drydock Co., 92 NLRB 547, and Schultz v. Refrigerated Service, Inc., 87 NLRB 502, would plainly have gone far enough to tolerate the sort of picketing here involved. There is a different trend in Washington Coca-Cola, 107 NLRB, No. 104, and in the Thurston Motor Lines, Inc., 110 NLRB, No. 122, and Campbell Coal Company,—the latter order being set aside in Sales Drivers, Helpers & Building Construction Drivers, Local Union 859, of International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers v. National Labor Relations Board, D.C.Cir., 229 F.2d 514, in a carefully reasoned opinion by Judge Fahy (the judgment of which now apparently is the subject of a petition for certiorari in the Supreme Court of the United States.)

Judge Fahy notes that in its evolution in this area of decision the Board has now made it a prerequisite that no situs for effective picketing other than the primary employer's place of business, or a place that is common to the primary employer and secondary employers, be available; and he suggests that, if the Board has gone this far, the Board is not really looking at the specific facts but operating by judicial fiat and thus acting in a manner which in other types of cases the Supreme Court has not approved. Perhaps Judge Fahy has somewhat overstated the Board's position, and maybe its counsel in this Court has somewhat overstated it, for my hasty examination of two recent decisions of the Board would indicate that there is no general dogmatic rule as yet. In Local 657 International Brotherhood of Teamsters, etc. and Southwestern Motor Transport, Inc., a decision in April of this year, the Board did recognize that there was a general rule that picketing away from the situs of the employer is prohibited by Section 8(b) (4) (A) and (B); but the Board added:

"There are, however, certain factual situations in which application of this general principle would lead to results at variance with the Congressional objectives, by foreclosing the right of a labor organization to bring pressure to bear on the primary employer."

And the Board then specifically refers on the next page to the fact that all of the phrases stated in its decision are the equivalent of a "rebuttable presumption." Moreover, in another case decided April 27th, which apparently represents the latest views of the Board, Sheet Metal Workers International Association, Local No. 51 and W. H. Arthur Company, the Board, while it seems to state that the Washington Coca-Cola decision lays down the inflexible rule that a union may picket only at the primary employer's place of business if the union could effectively publicize its dispute, in its opinion (perhaps in deference to the dissent) notes that it is also appropriate to give "consideration of all the union's activity," and it is in the light of the union's total activity that the majority of the Board felt compelled to conclude "that the union was seeking to widen the appeal to reach employees other than" the primary employer.

In short, the Board seems to have decisions which take into account the special circumstances, and, surely, those orders of the Board which have been affirmed, as well as those that have been reversed, show a great interest in the particular facts in the special circumstances of secondary picketing. See, for example: National Labor Relations Board v. Service Trade Chauffeurs, etc., 2 Cir., 191 F.2d 65; National Labor Relations Board v. Local Union No. 55, 10 Cir., 218 F.2d 226; and National Labor Relations Board v. General Drivers, Warehousemen and Helpers, Teamsters Local 968, C.A. 5 Cir., 225 F.2d 205.

■ To reduce, then, the foregoing analysis to its pith, it is my conclusion that the law is so doubtful and the rules of the Board so plainly admit of that type of flexible application customary in general equitable matters and more particularly in administrative areas, that I cannot say that a Court such as this is persuaded that it is reasonable to believe that, if the facts as finally developed by the Board coincide precisely with the facts as developed here, the Board would order, or the Court would sustain an order directing, the Union to desist beyond the scope of the stipulation which the Union's counsel has already indicated will govern its future policy.

Petition dismissed.