Bernard SAMOFF, Regional Director of the Fourth Region of the National Labor Relations Board, FOR AND ON BEHALF of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

LOCAL 8–732, OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, Respondent.

Civ. A. No. 3822.

United States District Court
D. Delaware.
Dec. 30, 1969.

F. L. Peter Stone, U. S. Atty., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Julius G. Serot, Asst. Gen. Counsel, Leonard Leventhal, Regional Atty., Region 4, Alfred Vitarelli and Harold Bernard, Jr., Philadelphia, Pa., Attys., N. L. R. B., Region 4, for petitioner.

Ernest S. Wilson, Jr., Wilmington, Del., for Industrial Warehousing Corp.

John Biggs, III, Wilmington, Del., and Richard Kirschner, Philadelphia, Pa., for respondent.

## OPINION

LATCHUM, District Judge.

The Regional Director of the Fourth Region of the National Labor Relations Board (the "Board") has filed a petition pursuant to Section 10(*l*) of the National Labor Relations Act, 29 U.S.C. § 160(*l*), (the "Act") for a temporary injunction pending the final adjudication before the Board of matters herein involved on a charge filed by Industrial Warehousing Corporation ("Industrial"), alleging that the respondent union has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(b) (4) (i) (ii) (B) of the Act, 29 U.S.C. § 158(b) (4) (i) (ii) (B), which proscribes secondary boycotts.

The petition requires this Court to make a dual determination: (1) whether the Regional Director has "reasonable cause to believe" that an unfair labor practice is being committed and (2) whether injunctive relief is "just and proper" under the circumstances. The facts pertinent to these determinations may be summarized as follows:

Since October 2, 1969 and continuing to the present, the respondent union has had a labor dispute with Avisun Corporation concerning the negotiation of a collective bargaining agreement. Avisun is a Delaware corporation with plant and offices near New Castle, Delaware within this jurisdiction and is engaged in chemical manufacturing. Its annual shipment of products outside of Delaware has a value in excess of $50,000. The respondent, an unincorporated association, is an organization in which employees participate and which exists for the purpose of dealing with employers concerning labor disputes, wages, rates of pay, hours of employment and conditions of work. Industrial, the charging party, is a Delaware corporation whose offices and warehouse facilities are located at Christiana and Terminal Avenues, Wilmington, Delaware and which is engaged in the business of providing warehousing services for industry. In the ten months since its organization, Industrial's principal function has been providing warehousing services to Avisun, whose plant is located about nine miles from Industrial's warehouse. During this period, about 85% of Industrial's warehouse capacity and space has been taken up with the storage of Avisun products. Industrial's warehousing services for Avisun have an annual value in excess of $100,000.

Since about November 13, 1969, the respondent union, in connection with its dispute with Avisun, has engaged in picketing at the entrance to the premises occupied by Industrial.[1] This picketing has caused drivers of common motor carriers to refuse to cross the picket lines to pick up Avisun's products stored at Industrial and has caused shipping companies to refuse to send trucks to Industrial's warehouse for this purpose.[2] Industrial charges that the respondent union, with whom it has no labor dispute, is committing an unfair labor practice by maintaining pickets at Industrial's warehouse site. Based upon this complaint, and his conclusion that there is "reasonable cause to believe" that the charge therein is true, the Regional Director instituted this present action for injunctive relief.

■ As previously noted, this Court first must determine from an independent examination of the facts and the law whether the Regional Director has "reasonable cause to believe" that the allegations of Industrial's complaint, charging the commission of an unfair labor practice, are true. The requirement of Section 10(l) of the Act that the Regional Director must have "reasonable cause to believe" that an unfair labor practice has been committed is met by a showing of reasonable probability that the petitioner will be entitled to final relief before the Board. Alpert v. Truck Drivers, Warehousemen and Helpers, etc., 161 F.Supp. 86 (N.D.Me.1958); Douds v. Confectionary and Tobacco Jobbers, etc., 85 F.Supp. 191 (S.D.N.Y.1949). It is not necessary to the granting of a temporary injunction that the Court find that the charges are true or that in fact a violation has occurred. The final determination of such matters is for the National Labor Relations Board subject to review by the Court of Appeals if and when enforcement or review is sought. Alpert v. Truck Drivers, etc., supra; Penello v. Milk Drivers & Dairy Employees Local Union, etc., 156 F.Supp. 366, 368 (D.Md.1957).

It does not follow, however, that a District Court automatically will grant injunctive relief upon the filing of a petition by the Regional Director. Although the Regional Director has alleged that he has "reasonable cause to believe" that an unfair labor practice is being committed, the Court here is not involved in the ordinary review of fact finding, rule making or the exercise of administrative discretion. Rather, the Court has been asked to grant a remedy substantially altering the status quo between the parties, before a violation of the Act has been finally established. In these circumstances, there must be an independent review by this Court of the law and facts to determine whether there is a reasonable probability that petitioner will be entitled to final relief before the Board. The scope of the Court's inquiry has been well stated by Judge Wyzanski in Alpert v. United Steelworkers, etc., 141 F.Supp. 447, 450 (D.Mass.1956): "What a court must do is to appraise the whole situation, exercising the best judgment it can as to what is the general scope of the facts likely to be proved before the Board, what are the issues of law, and how clear it is what rule of law would be and should be applied by the Board."

■ On the essentially undisputed facts before this Court, it does not appear that the Regional Director has established "reasonable cause to believe" that an unfair labor practice is being committed. In a recent decision, involving facts quite similar to those presented in this case, the Board ruled that the picketing of a warehouse facility utilized

---

1. Printed legend on the picket signs reads: "Local 8–732, Oil, Chemical and Atomic Workers, International Union AFL–CIO—On strike against Avisun Corporation" and in longhand writing continues "and against no other employer."

2. No evidence was presented that other users of Industrial's warehouses or the common motor carriers servicing the other users were affected by the picketing or complained to the Board.

by a struck employer does not violate the secondary boycott prohibition of the Act. United Steelworkers of America, AFL–CIO, and Local 6991, United Steelworkers of America, AFL–CIO v. Auburndale Freezer Corporation, 177 NLRB No. 108 (June 30, 1969). After carefully reviewing the precedents relied on by the Board in *Auburndale*, and recognizing the essential similarity of the facts between the present case and *Auburndale*, this Court concludes there is a substantial likelihood that the Board would find the *Auburndale* decision determinative of the present dispute between the parties. Therefore, there does not appear to be a reasonable probability that the petitioner will be entitled to final relief before the Board.

In *Auburndale*, the United Steelworkers were engaged in a labor dispute with Cypress Gardens Citrus Products, Inc. (Cypress) and in furtherance of that dispute, placed pickets at the truck entrance and the railroad entrance to the Auburndale cold storage warehouse, where Cypress fruit concentrate was stored. No Cypress employees performed work at the warehouse and there was no common ownership or control of the operations of Cypress and Auburndale. The Cypress fruit concentrate, however, was shipped to the warehouse in Cypress trucks. The trucks were unloaded by employees of the Auburndale warehouse. Instructions concerning the destination and mode of shipment by common carrier from the warehouse were provided by Cypress. Because of the seasonal nature of the Cypress operations, no Cypress trucks came to the warehouse during the period of the picketing. The Cypress fruit concentrate stored at the Auburndale warehouse accounted for 10% of the storage capacity of that facility.

In light of the above facts, the Board in *Auburndale* found that the Cypress fruit concentrate, while stored at the Auburndale warehouse, was "for all practical purposes under the control of Cypress"; that the warehouse was the place where common carriers received the Cypress product for delivery to Cypress customers and that the storage of the concentrate at the warehouse constituted "an integral part of the Cypress production process." The Board in *Auburndale* concluded that "[t]o the extent that the Auburndale warehouse is a part of the Cypress operation, we conclude that the warehouse constitutes a common situs" ·of the dispute between the Steelworkers and Cypress.

The facts of the present case fully warrant the conclusion that Industrial constitutes an integral and substantial part of the Avisun operations, and therefore, is a common situs of respondent's dispute with Avisun. Testimony by the owners and the manager of Industrial before this Court established without contradiction that 85% of Industrial's storage capacity is taken up with the storage of Avisun's finished products. (In contrast, in Auburndale, only 10% of the warehouse facility was taken up with the storage of the products of the struck employer.) Further, the amount of the finished Avisun products stored at the Industrial warehouse is a substantial portion of the Avisun finished product inventory. The testimony of the Director of the Avisun Inventory Control Department indicated that approximately 16 to 20% of the local Avisun inventory is stored at Industrial. Not more than 10% of the inventory is stored at the warehouse facilities of Avisun's plant.

Further, Avisun directs the delivery of finished products to the Industrial warehouse and the shipment of Avisun products from the warehouse to its customers. Before the strike, trucks procured by Avisun took the finished Avisum products to the Industrial warehouse.[3] At the direction of the Av-

---

**3.** Before the strike, 95% of Avisun's products were hauled to Industrial's warehouses by trucks of Yorklyn Transit Company, a contract carrier, owned by the same two brothers who are the exclusive owners of Industrial Warehousing Company. Since the strike, all finished products are removed from

isun Inventory Control Department, telex orders for the shipment of the Avisun products are sent to the Industrial warehouse, designating the destination and common motor carrier for each shipment. In addition, Avisun personnel periodically inspect the inventory of finished products stored at the Industrial warehouse facilities. Avisun employees who periodically visit the Industrial warehouse for this purpose include the Director of Inventory Control for Avisun, certain Avisun salesmen, the traffic controller at Avisun, and other members of the inventory control department.

In light of the above, this Court concludes that there is a substantial, integral relationship between the operations of Avisun and Industrial, and. that therefore, the circumstances of the present case come within the essential factual contours of the *Auburndale* decision. Moreover, in light of *Auburndale* and the precedents relied on therein, it appears that the picketing at Industrial's warehouse, appealing to the employees of common motor carriers who approach the facility to pick up Avisun products, is legitimate primary activity. In *Auburndale*, the Board concluded that "even if the picket line were viewed, because of the absence of striking employees from the site, as essentially an appeal to such common carrier employees who might approach the warehouse to pick up Cypress products, such appeals would, under the circumstances, constitute legitimate primary action."

At this point in its opinion, the Board cited the *General Electric* [4] and *Carrier Corporation* [5] cases. These cases established two essential principles in defining the scope of protected primary activity, exempt from the proscription of Section 8(b) (4) (i) (ii) (B). First, picketing and other appeals directed to employees other than those of the struck

employer (often referred to as "neutral" or "secondary" employees) who contribute to the ordinary operations of the struck employer are protected primary activity. Second, the situs alone does not determine whether the picketing is protected primary activity.

In *General Electric*, pickets appeared at a gate reserved exclusively for the employees of "independent contractors" performing work on the struck premises. Before the Supreme Court, the union contended that the *situs* of the picketing at the plant of the struck employer, without more, established the legality of picketing the "independent contractor's" gate. The Board contended that the standards governing "common situs" picketing under *Moore Dry Dock* (Sailor's Union of the Pacific, 92 NLRB 597) should apply. The Supreme Court accepted neither of these positions, concluding that the proper test was whether the work of the independent contractors contributed to the normal operations of the struck employer. If the work of the independent contractors was thus related by the ordinary operations of the struck plant, then picketing directed at employees of the independent contractor would be legitimate primary activity.

In the *Carrier Corporation* case, the picketing occurred on land owned by a railroad, immediately adjacent to the struck plant of Carrier, at the point where a railroad spur passed through a locked gate onto the Carrier premises. The picketing was directed at railroad employees attempting to remove several railroad cars from the Carrier plant. The Supreme Court, in finding *General Electric* controlling, ruled that the picketing was legitimate, and re-emphasized that appeals to neutral employees contributing to "the operations which the strike is endeavoring to halt" (376 U.S. at 499, 84 S.Ct. at 904) were permissible

Avisun's plant to Industrial's warehouse by rail.

4. Local 761, International Union of Electrical Radio and Machine Workers v. NLRB, 336 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961).

5. United Steelworkers of America, AFL–CIO v. NLRB, 376 U.S. 492, 84 S.Ct. 899, 11 L.Ed.2d 863 (1964).

primary activity. In affirming this principle, the Court stated that the location of the picketed gate upon railroad property had "little, if any, significance" (376 U.S. at 499, 84 S.Ct. 899).

The Board's conclusion concerning the primary character of the picketing in *Auburndale* seems consistent with the principles recognized in the *General Electric* and *Carrier* cases. It is of course true that the picketing in *General Electric* occurred at, and in *Carrier*, immediately adjacent to, the manufacturing facility of the struck employer. It appears, however, that the most important consideration in both *General Electric* and *Carrier* was the relationship of the work of the non-striking employees to the operations of the struck employer. And, as noted above, both *General Electric* and *Carrier* established that the situs of the picketing did not itself determine whether the picketing was legitimate primary activity.

Thus, the essential factor which renders the analysis in *General Electric* and *Carrier* applicable to *Auburndale* and the present case is the integral relationship of the particular facility picketed to the operations of the struck employer. Since the Board in *Auburndale* found a substantial relationship between Cypress and the Auburndale warehouse, it concluded that picketing directed to curtailing the functions of the warehouse facility integrally related to the operations of the struck employer—i. e. the shipment of products of the struck employer from the warehouse—was legitimate primary activity. To this Court, it appears that there is at least as substantial and integral a relationship between Industrial and Avisun as there was between the Auburndale warehouse and Cypress.

In summary, I find that (1) the *Auburndale* decision is consistent with the basic principles stated by the Supreme Court in the *General Electric* and *Carrier* cases, (2) the rationale of *Auburndale* appears fully applicable to the facts of the present case, and (3) the application of the *Auburndale* rationale by the Board would result in a finding that no unfair labor practice has been committed. Accordingly, I conclude that the Regional Director has not established a reasonable probability that he will be entitled to final relief before the Board. Therefore, the injunctive relief requested here would not be just and proper and the petition will be dismissed and the temporary injunction denied.

The above shall constitute findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

An order will be entered in accordance with this opinion.