George P. SHULTZ, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

LOCAL UNION 1694, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION and Arthur Wilson, individually and as President of Local Union 1694, International Longshoremen's Association, Defendants.

Civ. A. No. 3281.

United States District Court, D. Delaware.

March 13, 1970.

Del., and Martin J. Vigderman, of Freedman, Borowsky and Lorry, Philadelphia, Pa., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LATCHUM, District Judge.

In this action, instituted under the provisions of Title II of The Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 401 et seq. (the "Act") against Local Union 1694, International Longshoremen's Association (the "Union") and Arthur Wilson, individually and as President of the Union, the Secretary of Labor[1] seeks an injunction (a) to compel the defendants to file correct financial reports required by the Act, 29 U.S.C. §§ 431(b) and 437(b), for the years 1963 through 1968 and (b) to enjoin the defendants from future violations of these provisions.

The case was tried by the Court without a jury on February 2, 1970. The Court, having considered the testimonial and documentary evidence adduced at trial, the facts stipulated in the pretrial order, the arguments of counsel and the briefs submitted, enters the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Defendant Local Union 1694, International Longshoremen's Association is, and at all times relevant hereto, has been an unincorporated association maintaining its principal office at 6th and French Streets, Wilmington, Delaware. The Union is a labor organization engaged in an industry affecting commerce within the meaning of sections 3(i) and 3(j) of the Act, 29 U.S.C. §§ 402(i) and 402(j), and within the meaning of section 201(b) of the Act, 29 U.S.C. § 431(b). Defendant Arthur Wilson is president of the Union. The fiscal year of the Union runs from January 1 through December 31.

F. L. Peter Stone, U. S. Atty., Wilmington, Del., and Marshall H. Harris, Deputy Regional Sol., Department of Labor, Philadelphia, Pa., for plaintiff.

Bruce ·M.· Stargatt, of Young, Conaway, Stargatt & Taylor, Wilmington,

---

1. This action was commenced by the then Secretary of Labor, Willard Wirtz, on November 14, 1966. George P. Shultz, the current Secretary of Labor, has been substituted as party plaintiff pursuant to Rule 25(d) F.R.Civ.P.

2. Section 201 of the Act, 29 U.S.C. § 431(b), requires that every labor organization shall file annual financial reports, signed by the president and treasurer (or corresponding principal officers) of the union, providing information concerning the union's assets and liabilities, receipts and salary, allowances and other disbursements "in such detail, as may be necessary accurately to disclose its financial condition and operations for its preceding fiscal year." The legislative history of the Act reflects a Congressional purpose to assure high standards of union responsibility and fiscal integrity, to eliminate improper practices, to protect the individual rights of union members, and to protect democratic procedures in labor organizations.[2]

3. In the summer of 1963, Mr. Herbert J. Rose, a compliance officer with the Office of Labor Management and Welfare Pension Reports, examined the financial records of the Union. His examination indicated serious discrepancies and errors in the Union's financial records. Based on the results of this examination, Mr. Frank Williamette, the Area Director of the Office of Labor Management and Welfare Pensions Reports, requested the Union, on September 18, 1963, to "immediately file" amended financial reports for the fiscal years 1959, 1960, 1961 and 1962 "in order that a proper disclosure of the financial operations and condition of the union will be made."

4. During 1964 and early 1965 there were numerous contacts between the government and representatives of the Union, relating to the filing of correct amended reports for the years 1959–62. On February 4, 1965, the Area Director again wrote to Arthur Wilson, President of the Union, reminding him of the obligation to file a financial report for the fiscal year ending December 31, 1963, which had not been filed at that time, and also reminding him that March 31, 1964 was the deadline for filing the financial report for the fiscal year ending December 31, 1964. On July 16, 1965, the Area Director again wrote defendant Wilson to advise him that financial reports covering fiscal years 1963 and 1964 must be filed. In an attempt to facilitate the filing of financial reports for 1963 and 1964, the Area Director confirmed a previous understanding that in the absence of a complaint or further information amended financial reports for 1959, 1960, 1961 and 1962 would not be required.

5. On April 14, 1966, the required financial report for fiscal year 1965 was filed. On June 22, 1966, the Area Director again wrote to the defendant Wilson, demanding the filing of financial reports for 1963 and 1964. Although the government made further personal contacts with representatives of the Union even after this correspondence, the reports for 1963 and 1964 still had not been filed by November 14, 1966, when the present action was instituted. Financial reports covering the years 1963 and 1964 finally were filed on February 14, 1967.

6. In regard to the financial reports which the Union was required to file for the years 1963 and 1964, the record indicates that the Union exhibited carelessness and indifference in securing the effective assistance of accountants in preparing these reports.

During the period when the reports for 1963 and 1964 were to be prepared, the defendants employed a certified public accountant, Benedict Lebovitz, to whom all of the defendant's records had been submitted for preparation of the necessary forms. This accountant failed to prepare these forms, eventually went out of business and apparently turned his practice over to a second accountant in Wilmington, who also failed to prepare the necessary forms.

When the defendants became aware of the failure of these accountants to pre-

---

2. Int'l Broth. of Teamsters, etc. v. Wirtz, 120 U.S.App.D.C. 346, 346 F.2d 827 (1965).

pare the necessary forms,[3] they retained a third accountant, Murray M. Axelrod, C.P.A., of Philadelphia. Mr. Axelrod subsequently communicated with the two accountants who previously had possession of the Union's records and learned that the records had been lost or misplaced.

Subsequently, Mr. Axelrod and the defendant Wilson went to the former office of one of these accountants, and located several boxes and folders containing records of the Union. An examination of these records disclosed cancelled checks and bank statements for the year 1963 but nothing for the year 1964. The defendant Wilson, therefore, requested the bank to supply copies of the Union's statements and checks in order to assist Mr. Axelrod in reconstructing the records and completing the required reports in proper form.

The bank submitted photocopies of statements and cancelled checks but was unable to provide readable records[4] for the period from January 16, 1964 to February 15, 1964. Therefore, in accordance with generally accepted accounting practice, the accountant prorated the receipts and disbursements for the month for which records were not available, based on the eleven months of the year for which actual figures were available. After this adjustment was made, the required reports for 1963 and 1964, based upon all information and documents then available, were filed on February 13, 1967. On June 23, 1967 the United States Attorney for this District wrote to advise defendants' counsel that the Department of Labor had reviewed the LM-3 forms for 1963, 1964 and 1965 and had found "many errors and discrepancies." The Department's report stated that the LM-3 forms for 1963 and 1964 did not balance out on their face by the cash flow test.

This report was referred to Mr. Axelrod, defendant's accountant, who amended the LM-3 forms for the three years in question to reflect an adjustment of figures due to after-discovered outstanding checks as of December 31, 1963 and December 31, 1964. Copies of the amended LM-3 reports for these years were filed on September 6, 1967. These amendments showed a proper balance by the cash flow test for 1963. However, for 1964, there was still an unreconciled cash difference, due to the "annualization method" necessitated by the total absence of records for one month in 1964. Apparently, for the period for which records were lost (1/16/64–2/15/64) the actual receipts and disbursements were significantly different from the average for the other eleven months.

7. The financial report for 1966 was filed on March 30, 1967; the financial report for 1967 was filed on October 28, 1968 (approximately seven months late), and the financial report for 1968 was filed on June 24, 1969 (approximately three months late).

8. The original complaint in the present action, filed on November 14, 1966, did not challenge the accuracy of the 1965 report, which had been filed on April 14, 1966. Mr. Rose admitted that although he did communicate with the Union and Mr. Axelrod concerning the 1963 and 1964 returns, he never contacted any officer, representative of the Union or anyone else acting on behalf of the union concerning defects in the returns for 1965–68. He explained that the matter was no longer in his control, having been transferred to the office of the Solicitor of the Department of Labor.[5] Until several months before

---

3. Certain evidence indicated that Mr. Lebovitz and his successor were not paid for all of their work for the Union.

4. Testimony indicated that the bank's filming process was defective so that only

blurred and unreadable copies could be reproduced.

5. On June 23, 1967, the United States Attorney for this District wrote to advise counsel for the defendants that the De-

trial, the Government made no contact with the Union or its representatives concerning the reports for 1965–68, other than the brief reference to the 1965 report in the letter of the United States Attorney of June 23, 1967. The first indication to the Union of the defects which the Government found in the 1965–1968 reports was provided during a telephone conversation shortly before the pretrial conference held in this case on December 4, 1969. The letter from the Solicitor dated December 11, 1969, upon the instructions of the Court, for the first time set forth a specification of the defects in the 1964, 1966, 1967 and 1968 returns. At the commencement of the trial of this action, the parties consented to an amendment of the government's complaint which incorporated an allegation that "defendants have failed and refused to file Labor Organization Annual Reports" for 1965–1968, as well as for 1963–64, as alleged in the original complaint.

Mr. Nathan Rich, the defendant's present accountant, prepared the returns for 1966 through 1968. His testimony evidenced that many items stated to be absent or misplaced in these returns were included in the returns, but were not placed on the lines which the Government specified, or were lumped with other items, not in accordance with the instructions. The Government's questions concerning the large items involving the construction and the permanent mortgages on the Union's new building were explained by Mr. Rich, who acknowledged that he realized from the Government's testimony that they desired a more detailed explanation on the first page of the 1967 and 1968 returns. He acknowledged, however, that an examination of the reports by the Government could not reveal any explanation of the discrepancies, and that an examination of these reports by any member of the Union would not reveal any explanation for the discrepancies. Further, although a detailed explanation from the Government of inaccuracies and inadequacies in financial reports involved had been provided to Mr. Rich at least several weeks before trial, he was not able to explain fully at the time of trial the discrepancies in the reports involved.[6]

## CONCLUSIONS OF LAW.

The Union and its officers responsible under Sections 201(b), 206 and 207(b) of the Act, 29 U.S.C. §§ 431(b), 436 and 437(b), have failed to comply fully and promptly with the financial record keeping and reporting requirements imposed by these sections in regard to the filing of reports for the years 1963 through 1968,[7] and therefore the Union and its officers have been and continue to be in violation of these sections of the Act. While there is no evidence in the record of a deliberate attempt by any officer, member or representative of the Union to evade the requirements of the Act in regard to financial record keeping and reporting, the record is clear that the

partment of Labor had reviewed the LM–3 forms for 1963, 1964 and 1965 and had found "many errors and discrepancies." The letter did not refer to any specific errors in the 1965 report and the Government at this time did not seek to amend its complaint to cover the 1965 report.

6. For example, in the financial report for 1967 Item 20 reflects cash on hand at the start of the reporting period as $3,060.36, and the total receipts in Items 51 as $169,438.99, for a total of $172,499.35, which must be accounted for in a simple cash flow test. On this report, Item 70 reflects disbursements of $182,830.80, indicating a deficit of $10,331.45. However, Item 20 indicates cash in bank at the end of the reporting period of $15,245.30. Thus, there is an unexplained discrepancy in this report of $25,576.75. Mr. Rich attempted to explain these discrepancies at trial, but ultimately admitted the discrepancies could not be explained.

7. The record indicates that correct financial reports were not filed for the years 1959–1962. In an effort to facilitate union compliance in filing reports for 1963–68, the Government has abandoned its request for corrected reports for these years. No question concerning any violation of the Act in regard to the reports for 1959–62 is involved in the present action.

officers of the Union have exhibited carelessness and indifference in failing to secure effective assistance of qualified accountants in order to discharge the statutory responsibility of the Union and its officers for accurate financial record keeping and reporting.

The defendants have emphasized that because of their education and training, the Union officers could not be expected to prepare detailed financial reports for the Union. This argument is totally beside the point. The issue in the present case is not the competence of the Union officers to keep financial records and fill out financial reports, but the responsibility of the Union and its officers to secure regular and competent assistance in order to comply with the statutory requirements concerning accurate record keeping and reporting. Although the defendants further assert that certain accountants employed by the Union failed to complete the required forms and misplaced the Union's financial records, the record seems to indicate that these accountants finally refused to perform their duties because the Union had refused to pay for their services. In these circumstances, any failure of the accountants is a very insubstantial basis for excusing the failure of the Union and its officers to insure that records were properly kept and accurate reports promptly filed. In any event, any past default by an accountant cannot alter the essential fact that the Union and its responsible officers have violated (a) the duty imposed under Sections 431(b) and 437(b) of the Act to submit fully accurate reports for the years 1963–68, and (b) the duty imposed by Section 436 of the Act to keep financial records which permit verification of the accuracy of the financial reports submitted pursuant to Sections 431(b) and 437(b).

■ Having considered both the Union's past failures to keep accurate records and to submit satisfactory financial reports, and having considered as well the present efforts of the Union and its representatives to remedy these failures and to establish a basis for future compliance,[8] it is this Court's judgment that an injunction should issue (a) requiring Local Union 1694, the defendant Arthur Wilson and the Union's officers responsible for the filing of financial reports under 29 U.S.C. §§ 431(b) and 437(b) to file corrected, amended reports for the fiscal years 1966, 1967 and 1968, and (b) enjoining the Union and its responsible officers, as defined above, from further violations of the record keeping and reporting requirements of 29 U.S.C. §§ 431(b), 436 and 437(b). This injunction shall continue in effect for a period of five years, and, at the conclusion of this period, upon the application of the defendants, may be terminated upon a showing of satisfactory compliance with the conditions of such order.

■ The defendants contend that an injunction would be unfair and unduly burdensome in subjecting them to the "automatic" sanction of contempt. This argument is without merit. Under an injunction issued to secure compliance with the financial record keeping and reporting requirements of the Act, the defendants reasonably would not be punished for minor clerical mistakes. Contempt citations are not "automatic" but rest on an evaluation of circumstances as they arise. The purpose of an injunction here is to shift to the Union the responsibility for establishing compliance, rather than requiring continued initiatives by the Secretary of Labor in investigation and litigation. In this regard, it is the defendants who have the complete control of the circumstances

---

8. In an attempt to establish a basis for filing accurate reports for 1966 and subsequent years, the Government and counsel for the defendants have agreed to accept a starting figure of $5,334.26 for the 1966 amended report. The agreement on this figure for 1966 should facilitate the correction of irregularities and discrepancies in the report for this year and subsequent years.

which will determine whether any contempt proceedings are in order. Simply by complying with their present duties, as defined by statute, the defendants will be able to avoid any possible contempt citation.

Apart from this specific apprehension concerning the "automatic" imposition of contempt citations, defendants' opposition to an injunction appears to rest on the long standing and deeply felt distaste for injunctions on the part of unions and their attorneys. The injunction requested by the Government, however, is measurably different from the sweeping, *ex parte* injunctions which, in an earlier phase of economic organization and judicial philosophy, were issued to curtail the economic and organizational activity of unions. Such injunctions, supported by contempt proceedings, justifiably earned the suspicion and condemnation of labor leaders and their attorneys.[9] National labor policy now recognizes the right of industrial workers to organize, to bargain collectively, and to engage in concerted economic activity against an employer to secure the union's bargaining objectives. The power of courts to affect these areas of union activity by injunction has been severely limited[10] and reserved only for carefully defined circumstances.[11] In contrast, the injunction requested by the Government here in no way interferes with the power of the Union to engage in concerted economic activity to gain its bargaining objectives. The injunction requested simply commands the Union to fulfill statutory obligations which the Union, after repeated warnings, has failed to fulfill over a considerable period of time. The assurance of union fiscal integrity by statute and by judicial enforcement when necessary properly should be considered a positive influence in preserving the democratic and economic viability of a union in matters of self-government and industrial relations. An injunction will assure all members of the Union of full disclosure of its financial condition and thereby protect each member's interest in the responsible management of Union funds which are held in trust for all members of the Local.[12]

Further, in contrast to the *ex parte*, economic injunctions of the past, the injunction requested here will issue only after the conclusion of lengthy judicial proceedings, including a trial in this Court, in which the defendants have been fully represented by counsel at all times. In light of these circumstances, the Court finds unpersuasive the defendants' contention that an injunction, directing compliance with a presently defined statutory duty in regard to accurate financial record keeping and reporting, would be oppressive and unfair.

In circumstances where statutory duties of record keeping and reporting

9. See generally, Frankfurter and Greene, The Labor Injunction, 1930.

10. The Norris-LaGuardia Act, 47 Stat. 70, 29 U.S.C. § 101 *et seq.* substantially restricts the power of Federal Courts to grant injunctions in labor disputes. Further, under the pre-emption doctrine of San Diego Building Trades Council, Millmen's Union Local 2020 v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), conduct that is either "arguably protected" or "arguably prohibited" under the federal labor laws is not subject to regulation by the States. The primary jurisdiction to regulate such conduct rests with the National Labor Relations Board.

11. For example, Section 10(*l*) of the National Labor Relations Act, 29 U.S.C. § 160(*l*), provides for the issuance of limited preliminary injunctions against prohibited secondary boycott activity, upon a finding by the District Court of reasonable cause to believe that such prohibited activity is taking place. See Samoff v. Local 8–732, Oil, Chem. and Atomic Workers Int'l Union (D.Del. 1970), 307 F.Supp. 434.

12. "A basic purpose of the Act was to aid union members in securing information as to the financial affairs of their unions and the employment of union assets." Int'l Broth. of Teamsters, etc. v. Wirtz, 120 U.S.App.D.C. 346, 346 F.2d 827 (1965). In appropriate circumstances, which this Court finds in the present case, an injunction may be necessary to fulfill this "basic purpose" of the Act.

have been violated over long periods of time and in spite of repeated Government warnings, injunctions to insure future compliance have been issued. In Goldberg v. Cockrell, 303 F.2d 811 (5th Cir. 1962) the Wage and Hour Division of the Department of Labor had investigated the Cockrell Banana Company in 1953 and again in February and September of 1958. On each occasion the Department informed the defendants that it had found violations of the minimum wage, over-time and record keeping requirements of the Fair Labor Standards Act. Each time the defendants indicated that they would comply in the future but in each instance the assurances proved futile. The District Court found that the defendants had violated the Wage and Hour Act but declined to issue the injunction prayed for by the Secretary of Labor. In vacating this order of the District Court and remanding the case to the District Court "with instructions that the injunction be issued", the Court of Appeals for the Fifth Circuit pointed out some of the factors relevant to the granting of an injunction: "the employer's previous actions of noncompliance or litigation, the moral and business responsibility of the employer, the extent to which promises of future compliance are something more than empty, idle words unmatched by the institution of the effectual corrective procedures, or are undependable contritions under pressure of legal action, whether litigious contention is the legitimate good faith quest for legal determination or the mere pretense, for past or future actions, to thwart effective compliance." [13] The Court of Appeals in Goldberg v. Cockrell found its decision requiring issuance of the injunction consistent with the "growing line of cases" holding that "when an employer has committed a clear violation of the Act, without valid excuse or explanation * * * an injunction should be issued." [14]

The circumstances of this case are similar in important respects to those found relevant in the *Cockrell* decision. Repeated administrative warnings and judicial proceedings spanning more than three years have failed to effect full compliance by the defendants with the requirements of the Labor-Management Reporting and Disclosure Act. This Court has found that the defendants have committed repeated violations of the Act. Although the defendants have, since the institution of the present action, made more effective attempts to bring themselves into compliance with the Act, their record keeping and reporting still has not fully met the requirements of the Act as of this time. Therefore, there are substantial grounds for granting an injunction to insure the correction of past errors and compliance with statutory requirements in the future. As stated by the Court of Appeals for this Circuit in Shore v. Building and Construction Trades Council of Pittsburgh, 173 F.2d 678, 682, 8 A.L.R.2d 731 (3rd Cir. 1949):

> It is clear as a general proposition of equity that the granting of an injunction is not foreclosed because the act feared has already happened, if there is reasonable grounds for believing that it will be done again. And the defense that there is no longer need for an enforcement order because the complained of practices have, at least temporarily, ceased is one that has been threshed out many times in labor cases where it was the employer and not the union who made the point.

The Federal courts have "repeatedly stated that a violator of the law cannot escape injunctive proscription by ceasing the activity in which the legal violation occurred because such violator might later decide to resume such activity." Commissioner of Labor of the Virgin Islands v. Caribe Construction Co., 295 F. Supp. 459, 460 (D.C. Virgin Is. 1969).

A judgment will be entered in accordance with these Findings of Fact and Conclusions of Law.

13. 303 F.2d at 813.

14. Ibid.