Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

LOCAL 810, STEEL, METALS, ALLOYS AND HARDWARE FABRICATORS AND WAREHOUSEMEN, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent.

Civ. No. 60-C-237.

United States District Court
E. D. New York.

April 1, 1960.

Jacques Schurre, Washington, D. C., and Charles R. Ennis, New York City, for petitioner.

Henry Brickman, New York City, for respondent.

ZAVATT, District Judge.

This proceeding is before the court on a petition filed by the Regional Director of the Second Region of the National Labor Relations Board ("Board"), pursuant to Section 10(l) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 160(l) ("Act"), for a temporary injunction pending the final disposition of the matters involved herein now before the Board on a charge filed by Fein Can Corporation ("Fein"), alleging that respondent has engaged in, and is engaging in, an unfair labor practice within the meaning of Section 8(b) (4) (B) of the Act, 29 U.S.C.A. § 158(b) (4)

(B).[1] This section proscribes certain secondary pressures which have the effect of causing one person to cease dealing in the products of, or cease doing business with, another person.

The petition herein is predicated on petitioner's conclusion that there is reasonable cause to believe respondent has engaged in the unfair labor practice charged and that a complaint of the Board based on the charge should issue. This court having jurisdiction, the ultimate issue before me is simply whether such "reasonable cause" exists. See McLeod v. Local 868, International Bd. of Teamsters, D.C.E.D. N.Y.1960, 179 F.Supp. 921, 923. It was shown that on November 16, 1959, the employees of Fein, members of respondent, went out on strike. It is not contended that the strike against Fein is an unfair labor practice or that the picketing directed at Fein, or Fein's employees who may still be working, should be enjoined. In the jargon of the trade, this is primary picketing directed at the primary employer and is protected activity under Section 7 of the Act, 29 U.S. C.A. § 157. It is one of the accepted weapons in labor's arsenal.

The contested activity concerns "appeals" made to employees of Advance Trucking Co. ("Advance") and to understand the issues which thus arise a statement of the business operations of Fein and Advance is necessary.

Fein is a manufacturer of tin cans and pails. It is a wholly owned subsidiary of U. S. Hoffman Machinery Corp. ("Hoffman") and is part of Hoffman's can division, along with Commercial Can Corp. ("Commercial"), Standard Can Corp. ("Standard"), and Atlas Can Corp. ("Atlas"), other wholly owned subsidiaries of Hoffman. Fein occupies a seven-story plant in Bush Terminal, 50th St. and 1st Ave., Brooklyn, N. Y.[2] The building is surrounded by an open area, referred to as the yard, which is used as a truck park and for loading work. There is an entrance to the yard from the street. This same entrance is used by employees and trucks making deliveries. During the strike this entrance was the focal point of picketing at the plant.

Advance is engaged in inter-state trucking. It is owned by Pasquale Chimento who, in various corporate forms, also owns several terminals out of which Advance operates, including a terminal at Third Street and Bond Street in Brooklyn, referred to here as the Third Street Terminal. The Third Street Terminal is a small one-story warehouse with loading platforms fronting on Third and Second Streets. It is used primarily as a transfer point where over-the-road drivers deposit their loaded trailers which are then hauled away by the city drivers for local deliveries. Incoming goods not destined for immediate delivery may be stored for short periods in the warehouse or on the platforms. The work at the Third Street Terminal is performed entirely by Advance employees. No employees of Fein work there; nor do they pass through or otherwise use the terminal. However, as will be shown, goods

---

1. Sec. 8(b) "It shall be an unfair labor practice for a labor organization or its agents—
   \*    \*    \*    \*    \*
"(4) (i) \* \* \* to induce or encourage any individual employed by any person engaged in commerce \* \* \* to engage in, a strike or a refusal in the course of his employment to \* \* \* transport, or otherwise handle \* \* \* any goods \* \* \*; or (ii) to threaten, coerce, or restrain any person engaged in commerce \* \* \* where in either case an object thereof is—
  \*    \*    \*    \*    \*

"(B) forcing or requiring any person to cease \* \* \* handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person \* \* \*."

2. Atlas also occupies this plant. In fact, Fein and Atlas are two sides of the same coin. No attempt was made to distinguish between them as legal entities, nor is there any need to do so. It should be understood, however, that where the word "Fein" appears in this opinion it means "Fein and Atlas."

destined for Fein's customers, shipped from Standard and Commercial, are routed through this terminal.

Although Advance has other customers, its dealings with Fein provide the major portion of its business. Advance trucks in raw material to Fein; Advance employees unload on the platform at 50th Street where Fein's employees take it by elevator to the upper floors where other Fein employees process it. Eventually Fein employees bring the finished product down to the platform where Advance employees load it on Advance trucks for delivery to Fein's customers. Alternatively, Advance employees store the finished goods in Fein's first floor stock room, or in another warehouse rented by Fein.

In connection with this work at Fein's premises, Advance is given space for a dispatch office in the building. The office personnel are employees of Advance. Advance drivers and platform men report periodically to this office to receive their orders and directions from Advance supervisory personnel. Advance employees and trucks use the entrance to the yard already mentioned.

Advance was formerly owned by Irving and George Fein. In 1952 they sold their entire interest, stock and assets, to Pasquale Chimento. Pending the final payment of $20,000 the stock is being held in escrow by the Fein brothers' lawyer. Except for physical possession Chimento has all rights to the stock. Respondent concedes that Fein has no financial interest in Advance and the court so finds. A contract was negotiated between Advance and Fein in April, 1952, for the supply of trucking and related services. By its terms this contract is to run through 1962. Advance is to supply all Fein's requirements of trucks and personnel to operate and load them. Trucks, trailers, tractors are provided on a weekly basis for a fixed fee, called "rentals". Advance provides the gas and oil and services and maintains this equipment. Chauffeurs and platform men are supplied "at actual cost"— plus 2½% which represents supervision.

Advance carries liability, fire and theft insurance under which both Advance and Fein are covered. In addition, Advance has negotiated its own collective agreement with Local 807 and Advance hires and fires independent of Fein.

At the time Fein filed its charge with the Board, and at all times relevant to this inquiry, Fein had discontinued its manufacturing operation. It is supplying its customers from stock supplied by Fein's sister corporations and other manufacturers. If Fein's new status must be characterized, jobber or wholesaler would be appropriate terms.

This stock comes by rail and truck. The rail deliveries are made directly to a siding at Fein's 50th Street plant. Shipments by truck were also handled at the 50th Street plant during the early part of the strike but there came a time when the over-the-road drivers refused to cross the picket line at 50th Street. Thereafter these shipments were received at Advance's Third Street Terminal. Advance handles these shipments in the manner previously outlined.

It is not contested that respondent has picketed in front of the 50th Street plant since Nov. 16, 1959, and in front of the Third Street Terminal since Feb. 5, 1960. There was some conflicting testimony whether picketing continued after March 11, 1960, the day the order to show cause was signed, or even as late as March 21, 1960, when the hearing on this petition was concluded. But the dates and extent of picketing at Third St. are not crucial.

In addition to peaceful picketing, the testimony disclosed threats, coercion, assaults, batteries, intimidation, and monetary inducements by respondent directed at Advance employees. On the basis of the evidence there is "reasonable cause to believe" that respondent had the requisite, and proscribed object of forcing Advance to cease handling and transporting Fein's products.

The only substantial issue is whether Advance is a neutral employer or an ally of Fein. If Advance is a neutral the prayed for injunction against appeals di-

rected toward Advance employees must issue; if Advance is an ally, picketing by respondent to the extent that it is peaceful, is permissible.

Because the picketing was conducted at two different sites the case was argued as if different issues were presented at each site. Certainly it is true that the 50th Street plant is a "common situs" because both Fein and Advance employees work there, whereas the Third Street Terminal is not such a situs because only Advance employees work there. But if respondent prevails on the ally doctrine that will insulate its picketing at both sites. So that it will be seen that so far as the unfair labor practice is concerned the problems presented at the two sites are identical. It may be, however, that the nature and scope of relief that can be granted may be different at the two sites because it is agreed that primary picketing is lawful at 50th Street.

The ally doctrine subsumes two different concepts. As interpreted by most of the circuit courts and as generally used by the Board in proceedings before it, the doctrine is limited to the situation where the purported neutral employer is actually controlled by the primary employer, and in addition, performs a function that is integrated into the primary employer's operations. See J. G. Roy & Sons Co. v. N. L. R. B., 1 Cir., 1958, 251 F.2d 771, 773; Koretz, Federal Regulation of Secondary Strikes and Boycotts— Another Chapter, 59 Colum.L.Rev. 125, 142–44 (1959). Clearly the requisite control is lacking here to bring this case within this concept.[3]

The second circuit, however, views alliances differently, and perhaps more realistically. Regardless of control, when the employees of the purported neutral do work that the employer knows was formerly done by the striking employees of the primary employer, there is an alliance. N. L. R. B. v. Business Mach. etc. Mechanics Conference Bd., 2 Cir., 1955, 228 F.2d 553, certiorari denied, 1956, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (the Royal Typewriter Co. case); see Douds v. Metropolitan Fed. of Architects, D.C.S.D.N.Y.1948, 75 F.Supp. 672. In the Royal Typewriter case, Royal's repairmen-employees struck. When independent firms began to repair machines that Royal was obligated to service, these independents were picketed. The court of appeals held this picketing proper. In effect, third persons were denied a windfall—or at least, they were made to suffer the embarrassment attendant upon profiting from the misfortunes of others. In the instant case, however, the evidence fails to disclose that Advance employees are doing any work formerly done by Fein employees or, indeed, that they are doing any more work or that their work is any different in kind. They still load, unload, warehouse, drive, deliver. They work out of the 50th Street plant, a site where they always worked, and the Third Street Terminal, a new site only so far as Fein's goods are concerned.

Of course, it is true that the shipments to Fein's customers from Commercial and Standard, the sister corporations, may have the effect of breaking the strike here much as Royal's practice of farming out its repair contracts might have broken the strike of its repair personnel. But even if the policy of the Royal Typewriter case is to give labor a new weapon whenever the employer successfully parries the opening attack[4], respondent still need not prevail. For on direct analogy to Royal Typewriter, respondent would be authorized to enlarge its strike against Commercial and Standard whose employees are doing the work

---

3. Compare Local 24, International Board of Teamsters v. N.L.R.B., 1959, 105 U.S.App.D.C. 271, 266 F.2d 675 (picketing allowed against secondary employer which controlled primary employees).

4. "Where an employer is attempting to avoid the economic impact of a strike by securing the services of others to do his work, the striking union obviously has a great interest, and we think a proper interest, in preventing these services from being rendered." 228 F.2d at page 558.

formerly done by Fein's employees. Put another way, Fein's true allies are probably Commercial and Standard, not Advance.

This opinion constitutes the court's Findings of Fact and Conclusions of Law. Settle an order, consistent herewith, restraining respondent from picketing at the Third Street Terminal, and from inducing or encouraging any individual employed by Advance, or its related companies to cease handling Fein's goods with the object of forcing Advance to cease doing business with Fein.

Settle decree.