Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

UNITED AUTO WORKERS OF AMERICA, LOCAL 365, AFL–CIO, Respondent.

No. 61–C–1008.

United States District Court
E. D. New York.

Jan. 11, 1962.

---

3. See Thermo-Stitch, Inc. v. Chemi-Cord Processing Corp., 294 F.2d 486 (5th Cir. 1961), following the Beacon case.

Jacques Schurre, Washington, D. C., for petitioner.

Solomon B. Marcus, Brooklyn, N. Y., for respondent.

A. V. Cherbonnier, New York City, for charging party Intertype Company.

**BARTELS, District Judge.**

■ The Regional Director of the Second Region of the National Labor Relations Board (herein called "the Board") has filed this petition pursuant to Section 10(*l*) of the National Labor Relations Act, as amended 29 U.S.C.A. § 160(*l*) (herein called "the Act") for a temporary injunction pending the final adjudication before the Board of the matters herein involved on a charge filed by Intertype Company, a division of Harris Intertype Corp. (herein called "Intertype"), alleging that respondent has engaged in, and is engaging in, unfair labor practices within the meaning of Section 8(b) (4) (i) (ii) (B) of the Act, 29 U.S.C.A. § 158(b) (4) (i) (ii) (B), which proscribes secondary boycotts.[1]

Intertype is engaged in the manufacture and sale of typesetting machines and included in its plants in the United States is a plant located at 360 Furman Street, Brooklyn, New York, from which it ships goods to various customers and dealers outside of New York and outside of the United States. Respondent had a labor contract with Intertype which expired on October 1, 1961. Since October 3, 1961 respondent has been engaged in a labor dispute with Intertype and has picketed Intertype's Brooklyn plant. In addition to this picketing respondent has picketed Eagle Warehouse & Storage Company, Inc. (herein called "Eagle") at 28 Fulton Street, Brooklyn, New York, where Intertype stored on September 25, 1961 eight (8) machines (five (5) destined for Buenos Aires and three (3) destined for Iceland), and on September 29, 1961 one machine destined for Buenos Aires.[2] Respondent has no labor

1. Although such an injunction may be granted under Section 10(*l*) of the Act only if the Court finds that there is reasonable cause to believe that the charge is true, it is not necessary that the Court find that, in fact, there has been such a violation of the Act. Douds v. Milk Drivers & Dairy Employees Union, 2 Cir., 1957, 248 F.2d 534, 538; Madden v. International Organization, etc., 7 Cir., 1958, 259 F.2d 312, cert. den. 358 U.S. 909, 79 S.Ct. 236, 3 L.Ed.2d 229.

2. Intertype's shipments exceed $6,000,000 annually and consist of approximately 400 machines. Intertype's merchandise stored with Eagle consists of nine (9) machines with an approximate value of $110,000. The storage charges with respect thereto represent no more than 1/10th of 1% of Eagle's business.

dispute with Eagle, and the evidence establishes that Eagle had no knowledge of the labor dispute between Intertype and respondent or in any way cooperated with Intertype in connection with such a dispute. In November, 1961, when Intertype attempted to remove for foreign shipment, by means of an independent trucker, some of the machines from Eagle, it was unable to do so for the reason that employees of Eagle refused to handle the machines because respondent was picketing Eagle.

Respondent claims that Intertype stored these machines in anticipation of a strike, which Intertype denies. In support of its claim respondent established that there is ample space in Intertype's premises for storage of the machines. Moreover, it claims that the actual shipment of these machines from eagle to the dock requires additional work of loading and taking and receiving receipts ordinarily performed by respondent, for which, it alleges, Intertype has engaged Eagle to perform, thus making Eagle an ally of Intertype, citing Patton Warehouse, Inc., N.L.R.B. Case No. 9–CE–5–1–2; Arkansas Best Freight System, Case No. 9–CC–286; N.L.R.B. v. Business Machine etc., Local 459, 2 Cir., 1961, 289 F.2d 62; N.L.R.B. v. Business Machine etc., Local 459, 2 Cir., 1955, 228 F.2d 553; and Seafarers International Union, etc. v. N.L.R.B., 1959, 105 U.S. App.D.C. 211, 265 F.2d 585.

It is true, as the evidence shows, that there was available space in Intertype's premises for the storage of the machines. However, the evidence also shows that Intertype had on the following prior occasions stored machines with Eagle; 1950, 11 different units; 1952, 1 unit; 1953, 1 unit; 1955, 1 unit; and on June 30, 1961, 1 unit, and, further, that storage of all of the foregoing machines with Eagle was due to a delay in the completion of financial arrangements with Intertype's dealer or customer, which is the reason given by Intertype in the present case for the storage of the nine (9) machines with Eagle. Respondent, however, points out that in the past Intertype permitted machines to be stored in its own premises where shipment had been delayed because of similar failures to complete financing on the part of the dealer or customer, i. e., upon two occasions when shipment to Brazil was delayed for approximately six months, and upon three other occasions when shipments to one foreign and two domestic customers were delayed for over a month.

The testimony by Intertype indicates that this was the first strike by respondent against Intertype in 45 years, and that on October 17, 1958, the very day when the last union contract was signed by the parties, Intertype stored machines with Eagle; that although a strike vote was taken on September 18, 1961, while the parties were negotiating, strike votes had also been taken in the past near the expiration of the prior labor contracts which did not result in a strike, and hence Intertype argues there was no certainty of a strike at the time the machines were stored in September, 1961 to justify the charge that the storage was in anticipation of the strike.

Before considering defenses it is essential that the Court determine whether the wording or spirit of the Act was violated.

Section 8(b) (4) (i) (ii) (B) of the Act makes it an unfair labor practice for a labor organization or its agents to engage in, or to induce or encourage any individual employed by any person engaged in commerce, to engage in a strike or a refusal in the course of his employment to use, or otherwise *handle* or to perform any services, or to threaten, coerce, or restrain any person engaged in commerce, where in either case an object thereof is "forcing or requiring any person to cease using, selling, *handling*, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease *doing business* with any other person * * *". (Italics supplied.)

Strictly speaking, respondent's activity comes within the wording of the Act because employees of Eagle were induced

to refuse to handle Intertype's machines and also to cease doing business with Intertype insofar as Eagle was prevented from fulfilling its contractual obligation with Intertype to deliver in November the machines called for by Intertype's trucker. Was the purport of the Act to prevent this type of activity in view of the absence of any interference with Eagle's other business or any particular detriment to Eagle?

■ The Court believes that this type of activity is within the purview of the Act even though the secondary employer has suffered little or no damage. It is sufficient if the unoffending secondary employer is subjected to pressures in a controversy not its own. N.L.R.B. v. Denver Bldg. & Const. Tr. C., 1951, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284; see also Teamsters, Local 135, 1955, 114 N.L.R.B. 639, and 105 Cong.Rec. 16254–55, September 2, 1959; Legis.Hist. 1388. Moreover, the action of respondent herein has interfered with the contractual duty of Eagle to redeliver the goods to its bailor. Local 135, International Brotherhood of Teamsters, 1960, 126 N. L.R.B. 251; see also Retail Fruit & Vegetable Clerks Union, etc. v. N.L.R.B., 9 Cir., 1957, 249 F.2d 591.

Whether the September storage was in anticipation of the strike would be relevant only if it can be established that Eagle is an "ally" of Intertype either by reason of intercorporate relationship or because it received work "farmed out" by Intertype. Certainly there is no such relationship here of parent and subsidiary as was found in Douds v. Metropolitan Federation of Architects, etc., D.C. N.Y.1948, 75 F.Supp. 672. Since there was no work or service normally performed by Intertype that Eagle was engaged to perform, it cannot be said that Intertype had "farmed out" work to Eagle within the framework of N.L.R.B. v. Business Machine etc., Local 459, 2 Cir., 1955, 228 F.2d 553; see also Teamsters, Local 135, supra.

Respondent claims that the work of loading the machines on trucks and the delivery and receipt of transportation documents is work normally performed by members of respondent which is now to be performed by employees of Eagle. But respondent's members perform this work only when the machinery leaves Intertype's plant, and in fact they have performed exactly those functions in connection with the machines presently stored at Eagle. There was no further work to be done by respondent as to the machines; consequently, there was no shunting by Intertype to neutrals of work generally done by respondent.

■ Lastly, this is not a situs situation within the purview of the Moore Dry Dock Case (Sailors' Union of the Pacific, 1950, 92 N.L.R.B. 547) or Seafarers International Union, etc. v. N.L. R.B., supra, because there is no sharing of a common situs by Intertype and Eagle. Intertype has a permanent place of business which is being effectively picketed and one of the objectives of the picketing against Eagle is pressure upon the secondary employer.[3] Under the circumstances the situs of the nine (9) finished machines crated and stored for shipment in a neutral warehouse cannot be considered as a partial situs of this labor dispute. Neither by the situs test nor by the nature of work test is this boycott justified. Cf. Local 761, International Union of Elec. Radio and Machine Workers, A.F.L.–C.I.O. v. N.L.R. B., 1961, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592; see 47 Va.L.Rev. 1164.

Assuming that the Board has reasonable cause to believe that a violation has occurred, respondent questions the right of the Board to an injunction, citing the fact that Eagle has not been harmed, that the machines represent an infinitesimal portion of Intertype's operations, and that respondent will suffer "serious injury" as the result of an injunction. The Court in applying the usual equity considerations, has concluded that there are

3. See Respondent's Memorandum of Law, p. 12.

considerations to be weighed other than those set forth by the respondent.

The labor dispute between respondent and Intertype has resulted in the closing down of all operations at Intertype's plant at Furman Street, and thus the picketing of the secondary employer adds very little to the economic impact of the strike, particularly if the stored machines are an "infinitesimal part" of Intertype's business. Moreover, if the picketing is illegal, Eagle is prevented from completing its contractual obligations with Intertype, which in turn is prevented from making shipments as required by its orders from foreign dealers.

The Court finds that the Board had reasonable cause to believe that the respondent has engaged in, and is engaging in, a violation of the Act and accordingly concludes that a temporary injunction should be issued pursuant to Section 10 (*l*) of the Act. Findings of Fact and Conclusions of Law have been signed in accordance with the foregoing.