AUBURNDALE FREEZER CORP., and
Minute Maid Company, Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 28522.

United States Court of Appeals,
Fifth Circuit.

Dec. 3, 1970.

Granville M. Alley, Jr., Tampa, Fla., William R. Radford, Miami, Fla., for petitioners.

Bernard Kleiman, Gen. Counsel, Pittsburgh, Pa., Bredhoff, Gottesman & Cohen, Washington D. C., Cooper, Mitch & Crawford, George C. Longshore, Birmingham, Ala., for intervenor United Steelworkers of America, AFL-CIO.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Abigail C. Baskin, Atty., N. L. R. B., Washington, D. C., Harold A. Boire, Director, Region 12, N. L. R. B., Tampa, Fla., for respondent.

Jesse S. Hogg, Miami, Fla., for American Warehousemen's Assn. amicus curiae.

Benjamin Werne, New York City, for Nat'l. Assn. of Refrigerated Warehousees, Inc., amicus curiae.

Before JONES, WISDOM, and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge:

The issue for decision is whether a labor union by picketing the premises of neutral employers committed a secondary boycott in violation of § 8(b) (4) (i) and (ii) (B) of the National Labor Relations Act, as amended.[1]

---

1. 29 U.S.C.A. § 158(b) (4) (i) and (ii) (B).

Section 8(b) (4) of the amended Act makes it an unfair labor practice for a union

(i) to engage in, or to induce or encourage any individual * * * to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise

The Hearing Examiner found in the affirmative and recommended the issuance of a cease and desist order. The National Labor Relations Board, by a vote of 3 to 2, held to the contrary, dismissing the consolidated complaints.[2]

We grant the petition for review, vacate the Order of the Board, and remand for the entry of the recommended cease and desist order.

The neutral employers were Auburndale Freezer Corporation and Minute Maid, another corporation.

Auburndale is the sole owner of a public cold storage warehouse at Auburndale, Florida. It has only three employees, a general manager, an office secretary, and a maintenance man.

By contract with Minute Maid, the work of unloading deliveries to the warehouse, furnishing bills of lading, placing contents in storage, and servicing outgoing shipments on freight cars and trucks (common carriers) is performed by thirty employees of *Minute Maid*. Those employees work under the direction of Minute Maid's superintendent, who takes his instructions from Auburndale's general manager.

Auburndale's freezer plant can store approximately three million cases of citrus concentrate at any one time. Auburndale has about *twenty* cold storage customers, such as Minute Maid, from its nearby citrus processing plant, General Foods, Florida Home Juice, Cypress, and others.

About five or six miles from Auburndale, at Eloise, Florida, Cypress Gardens Citrus Products, the primary employer in this dispute, operates a citrus processing plant, including some warehouse facilities. No employee of Cypress has ever worked at the Auburndale warehouse. Cypress had a contract with Auburndale which obligated the latter to furnish the former storage space for up to 300,000 cases of citrus concentrate (approximately 10% of the Auburndale storage space) at a specified price. If Cypress wished to store any of its processed products at Auburndale its trucks, loaded with its product, driven by its employees, went to the warehouse facility. The Minute Maid employees unloaded the Cypress truck by forklift and placed the product in storage. A receipt was given the Cypress driver, who then left the warehouse. Cypress is not allotted any particular portion of or space in the warehouse. Its goods, however, are placed in identifiable rows or stacks, as is the case with other customers of the warehouse. When Cypress sold the goods (not at retail) it issued Auburndale instructions to ship the product. The Minute Maid employees then load the goods, as per instructions, on either railroad cars or trucks.

The busiest period at Auburndale is from March until July, peaking in June, the height of the citrus season.

On October 15, 1967, after a breakdown in bargaining negotiations, Local 6991, United Steelworkers of America, AFL-CIO, struck Cypress. The Union had no dispute with either Auburndale or Minute Maid *or any other employer* which stored its products at the warehouse. Two days later, about fifteen striking Cypress employees began picketing the entrance at Auburndale, ordinarily used by Cypress drivers and the warehouse employees. Occasionally, the railroad siding where it enters the Au-

handle or work on any goods, articles, materials, or commodities or to perform any service; or

(ii) to threaten, coerce, or restrain any person * * * where in either case an object thereof is:

   *      *      *      *

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *; Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

2. 177 NLRB No. 108, June 30, 1969.

burndale plant was also picketed. The pickets carried signs which read as follows:

"Employees of Cypress Gardens Citrus Products are ON STRIKE. We have no dispute with any oher employer. United Steel Workers of America, Local 6991, AFL-CIO."

After two weeks the pickets had diminished to two in number. The picketing was maintained at all times when the Minute Maid employees were working at the warehouse.

October was a very slack time in citrus operations. Cypress sent no trucks to Auburndale while it was being picketed. Neither did Auburndale ship any of the Cypress products via common carrier. Auburndale had nothing to do with product sales.

Auburndale and Minute Maid separately charged the Union with engaging in an unfair labor practice. The General Counsel consolidated the cases and issued a complaint that the Union had engaged in picketing, etc., with the object of forcing and requiring Auburndale, Minute Maid, and others to cease using, selling, handling, transporting, or otherwise dealing in the products of and to cease doing business with Cypress, contrary to the statute.

Pursuant to a hearing held in due course, the Trial Examiner concluded that the picketing

"Induced and encouraged individuals employed by Auburndale *and other secondary employers* (emphasis ours) to cease performing services for their respective employers, and (2) coerced and restrained Auburndale, an object thereof being to force or require Auburndale to cease doing business with Cypress in violation of § 8 (b) (4) (i) and (ii) (B) of the Act."

A majority of the Board [3–2] disagreed with the Trial Examiner. It held that Cypress' activities at Auburndale constituted an integral part of the Cypress *production process* (emphasis ours) and that the warehouse, "to the extent that [it] is a part of the Cypress operation" constituted a common situs. The majority further concluded that "the picketing conformed in all respects with Moore Dry Dock requirements for legitimate common situs picketing".

The Board based its decision on "sufficient presence" of the primary employer at the secondary site, that there was a direct and immediate relationship between the picketing and the object of the picketing sufficient to support a finding of purely primary picketing. It held that the concentrate while stored at the warehouse was, for all practical purposes, under the control of Cypress, that common carriers there received Cypress goods for delivery to Cypress customers.

The dissenting Board Members pointed out that Auburndale was furnishing warehouse services on its own separate premises to various citrus processors, that Cypress employees performed no function at Auburndale other than the delivery of products by truck, that Cypress sent no trucks to Auburndale while picketing was in progress, that Cypress' presence at Auburndale was nothing more than the presence of the "primary employer's product on the separate premises of a neutral employer independently engaged in the business of providing cold storage services to its customers, and that Cypress provided only a minor portion of the Auburndale business".

The dissenting Members further stated that the Board had never hitherto held that the mere presence of a primary employer's goods on the premises of a neutral employer, pursuant to an established business relationship, is sufficient in and of itself to convert the picketing of such neutral premises from unlawful secondary to lawful primary picketing.

These Board Members concluded that "the only possible thrust of Respondent's picketing appeal must have been directed to the neutral Auburndale, to the neutral employees engaged in warehousing tasks, *or to neutral employees of Auburndale's other customers* (emphasis ours). This is the classic example of the secondary boycott proscribed by the statute".

This case is of supreme public importance. The inescapable effect of the Board decision would be to inject a public warehouse operator and other employers who use his facilities into the labor disputes of all customers. A public warehouse could be subject to picketing at any time a labor organization engages in a dispute with any employer who happens to be a customer of the warehouse. The impact on the general welfare could be especially critical in those instances where, as here, perishable food products intended for human consumption are substantially involved.

On the undisputed facts in this record we are of the opinion that this case may not properly be decided on strained or ephemeral extensions or constructions of *situs*, applied out of context. The subsidiary question of situs may not obliterate the major question: On the undisputed facts, did the picketing at Auburndale violate the statute?

The statute, 29 U.S.C.A. § 158(b) (4) (i) and (ii) (B) unmistakably makes it an unfair labor practice for a union to coerce or restrain any person with the object of forcing or requiring him to cease * * * handling * * * the products of any other producer or processor except by primary strikes or primary picketing [Fn. 1].

There was no strike against Auburndale or Minute Maid or against the nineteen other employers who stored their products at that warehouse.

The processing plant of Cypress, five miles from Auburndale, was, of course, struck and picketed. That is where the employees of Cypress processed the citrus. That was the real situs of both the dispute and the strike. That was the place for primary picketing. No Cypress employees were at work at Auburndale, and never had been.

The statute prescribes the reviewing role of this Court. We are first to determine if the Board findings are supported by substantial evidence, viewing the record as a whole. Then we are to determine whether the Board correctly applied the law, 29 U.S.C.A. § 160(e), (f). The basic evidentiary facts in this case are not in dispute.

On the undisputed facts it is "quite clear what the truth" of this case is, see N. L. R. B. v. Smith Industries, Inc., 5 Cir., 1968, 403 F.2d 889, 893. There is no rational basis in this record upon which reasonable men might differ as to the facts.

We hold that the real, indeed the only substantial, object for the picketing at Auburndale, by means of a picket line away from the true situs of the controversy, was to shut down operations at a frozen food storage warehouse in which the stored products of the primary employer then constituted only 5% of the total capacity of the facility and could never have exceeded ten per cent. Inescapably, the purpose was to halt the operations of other employers who were entitled to use not less than 90% of the space and who were total strangers to the whole controversy.

It necessarily follows that the finding of the majority of the Board that the picketing was entitled to primary classification is not supported by substantial evidence from the record as a whole and was legally erroneous.

The picketing was prohibited by the plain terms of the statute.

The Order of the Board dismissing the consolidated complaints is vacated and the case is remanded with directions to enter the cease and desist order recommended by the Trial Examiner.

Vacated and remanded, with directions.

WISDOM, Circuit Judge (dissenting).

I respectfully dissent.

## I.

The line between legitimate primary and unlawful secondary activity is relatively easy to draw where the primary and secondary employers have separate work-sites. A more difficult problem is presented in the common situs cases— "where both the struck employer and 'secondary' or 'neutral' employers are

carrying on business activities." Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 1969, 394 U.S. 369, 388, 89 S.Ct. 1109, 22 L.Ed.2d 344. As the Board observed, "[i]n determining whether or not the Auburndale warehouse is a common situs the question is whether or not there is sufficient 'presence of the primary' at the secondary site". The Board correctly noted that " 'presence of the primary' is a term of art and refers to a multitude of factors that are to be evaluated in light of the union's presumably permissible 'primary' objective of bringing about a complete cessation of the primary employer's operations. I would hold that the storage and processing of Cypress' concentrate at the Auburndale warehouse was an integral part of the Cypress production process, and the warehouse was a common situs for purposes of Section 8(b) (4) (B) of the Act. As I see it, therefore, the picketing at that situs was lawful primary activity under Section 8(b) (4) (i) and (ii) (B) of the Act."

## II.

Cypress, the primary employer, processes citrus fruits at its plant in Eloise, Florida. Since 1956 Cypress has been storing its products at Auburndale's cold storage warehouse, located five or six miles from the Cypress plant. This warehouse is staffed by three Auburndale employees—a manager, a secretary, and a maintenance man—and by 30 employees of Minute Maid who, under a contract, perform all the general warehousing services. No Cypress employees work at the warehouse. Auburndale is the sole owner of the warehouse and completely controls its operations.

Minute Maid is a Florida corporation also engaged in the business of processing citrus fruits and juices. Minute Maid owns and operates a plant in Auburndale near the warehouse. Under a lease arrangement, Minute Maid had for twelve years a first option to lease 135,000 sq. feet of space in the warehouse for the storage of its products or about fifty percent of the usable warehouse space. Minute Maid, by contract with Auburndale, provides the labor for the performance of all warehousing services at the warehouse. This includes the unloading and loading of trucks and railroad cars and the handling of all products in and out of storage, both with respect to Minute Maid and those of the other customers who utilize the storage space not allocated to Minute Maid. Minute Maid bills Auburndale directly and is paid by the latter for all the warehousing services provided. Auburndale in turn independently bills the other customers. Minute Maid has a superintendent who is responsible for supervising the thirty employees performing the warehouse services. In January 1967, Cypress and Auburndale executed a five-year contract under which Auburndale agreed to furnish Cypress space for up to 300,000 cases of citrus concentrate. This entails approximately 10 percent of the total storage space at the warehouse. Cypress agreed to pay a minimum annual rental of $25,000 for storage space.

In the regular course of business, Cypress trucks haul citrus concentrate to the warehouse, Minute Maid employees drive onto the truck, unload the product, and place it in storage. The Cypress driver does no work at the warehouse and leaves after he is given a receipt. During the peak season for processing citrus fruits, from March through July, Cypress trucks arrive at the warehouse "continuously". Cypress vehicles also come to the warehouse to "deliver orders or releases from the bank" and, on occasion, Cypress drivers pick up concentrate stored in drums at the warehouse and return it to the Cypress plant where it is placed in smaller containers and packed in cases. Generally, however, the storing of concentrate at the warehouse is the final step in the Cypress production process. Upon the sale of its concentrate, Cypress gives Auburndale an order to ship the product. The product is then loaded by the Minute Maid employees onto the trucks or railroad freight cars of the designated common carrier.

On October 15, 1967, the contract negotiations which the Union and Cypress had been conducting broke down and the Union struck the Cypress plant. The strike was extended to the Auburndale warehouse on October 17. That day strikers appeared at the warehouse and picketed, bearing signs which read

Employees of Cypress Gardens Citrus Products are ON STRIKE. We have no dispute with any other employer. United Steelworkers of America, Local 6991, AFL–CIO.

The only evidence of a picket's speaking to anyone at the warehouse is the testimony of Auburndale's manager that, on the first day of picketing, he asked "some woman" on the picket line the reason for the picketing and she replied: "Well, you got our product in there".

When the picketing began on October 17, there were as many as 15 pickets at the warehouse; when it ended on or about October 21, there were two pickets present. During this period, the pickets patrolled the warehouse entrance used by all truckers and employees working at the warehouse, from the opening of the warehouse in the morning until it closed in the evening. "[A]t times" pickets also patrolled the railroad siding located on Auburndale's property approximately 400 feet from this entrance. While the picketing was in progress, no Cypress truck drivers came to the warehouse. However, Cypress had 150,000 cases of concentrate stored at the warehouse throughout this period. There is no evidence that the picketing interfered with any operations at the warehouse. After the charges herein were filed, the Union stopped picketing and consented to entry of a federal district court order granting a temporary injunction.

The physical presence of the primary's employees on the secondary employer's premises is a relevant factor in determining whether the premises are a common situs. But it is not necessarily the critical factor. Here, although there were no Cypress employees at the Auburndale warehouse during the picketing, there were 150,000 cases of Cypress concentrate at the warehouse. These cases occupied ten percent of the warehousing storage space. They required continuous operations by employees of Cypress, Auburndale, and Minute Maid acting for Auburndale and Cypress. This concentrate while stored in at the warehouse was subject to the control of Cypress. Cypress gave shipping instructions for moving the concentrate from the warehouse to its customers. It is a fair statement that the storage of concentrate in the warehouse subject to disposition by Cypress constituted the final step in the Cypress production process. In the construction industry common situs cases may turn on the presence or absence of the primary's employees at the secondary employer's work-site. Local Union No. 519, United Ass'n of Journeymen, etc. v. N. L. R. B., 1969, 135 U.S.App.D.C. 105, 416 F.2d 1120, 1124. Here, however, the presence or absence of the primary's employees at the warehouse is of less importance than the presence of the primary's product and the close relationship of the warehousing operation to the Cypress production operation as a whole.

### III.

The peculiar facts of this case distinguish it from common situs cases usually recognized as authoritative. The hearing examiner relied on Warehouse Union Local 6, et al. (Hershey Chocolate Corp.), 153 NLRB 1051 (1956), enf'd, 9 Cir. 1967, NLRB v. Warehouse Union Local 6 etc., 378 F.2d 1; Local 868, International Brotherhood of Teamsters (Mercer Storage Co., Inc.), 156 NLRB 67 (1965); Western States Regional Council No. 8, International Woodworkers of America, AFL–CIO (Priest Logging, Inc.), 137 NLRB 352 (1962); and Local 810, Steel, Metals, Alloys and Hardware Fabricators and Warehousemen (Fein Cam Corporation), 131 NLRB (1961), enforced 2 Cir. 1962, NLRB v. Local 810, Steel, etc., 299 F.2d 636. But as the Board pointed out: "In *Hershey, Mercer,* and *Priest* the dispositive issue was whether or not the secondary employer was per-

forming struck work and was thus an "ally" of the primary; the issue of common situs was not discussed. In *Fein* the Primary employer's premises, which were also used by a separate trucking company, were found to constitute a common situs but the issue was not discussed with respect to a separate warehouse used by the secondary employer."

The cases on which the petitioners rely have some elements similar to the elements in the instant case, but are not close enough in the critical facts to carry the weight the petitioners attach to them. For example, in National Maritime Union v. N. L. R. B. (Farmers' Union Grain Terminal Ass'n), 8 Cir. 1966, 367 F.2d 171, cert. denied, 386 U.S. 959, 87 S.Ct. 1030, 18 L.Ed.2d 108, the primary's employees towed barges up the river, delivered them to a fleeting area where they were tied off, picked up the south-bound tows, and returned to St. Louis without ever getting off the barges. The primary employer, therefore, ceased to have any control over the barges or the material thereon after they were tied off, and accordingly maintained no presence on the tows by the time they were picketed. In McLeod v. Local 810, etc., Teamsters, Chauffeurs, Warehousemen & Helpers of America, E.D.N.Y.1960, 182 F.Supp. 552, the picketing by the primary employer's production employees, occurred at a terminal owned and operated by a trucking company which transferred goods to and from the primary employer's plant under contract. The terminal operated principally as a transfer point where over-the-road drivers deposited their goods for delivery to the primary, and occasionally as a storage point for incoming goods; however, the primary employer had no control over the transportation process, that process was not in any sense integrated into the production process, and no part of the production process ever occurred at the terminal. Finally, although both McLeod for and on Behalf of NLRB v. United Auto Workers of America, Local 365, AFL–CIO, E.D.N.Y.1962, 200 F. Supp. 778, and Penello for and on Behalf of NLRB v. Glass Bottle Blowers Ass'n

of United States & Canada, AFL–CIO, D.Md.1968, 280 F.Supp. 643, involved picketing at a warehouse belonging to a neutral employer and containing the product of the primary employer, in neither case was it either contended or shown that the storage process constituted an integral part of the primary employer's operations over which he retained substantial control. In McLeod for and on Behalf of NLRB v. United Auto Workers, etc., the primary employer had storage facilities on his own premises, had only stored his products at the neutral employer's warehouse sporadically in the past, and did so on this occasion, as in the past, solely because of a delay in the completion of some financial arrangements with his customer. In Penello for and on Behalf of NLRB v. Glass Blowers, the primary employer simply shipped his goods via common carrier to the warehouse for storage and transshipment, retaining no further interest in or control over them.

In sum, I find that there are enough factors establishing the presence of the primary employer at the warehouse to justify the Board's conclusion that the warehouse was a common situs. I do not say that any warehouse is a common situs under the Act for the warehouseman and the primary employer who stores his goods in the warehouse.

IV.

Section 8(b) (4) reflects "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." N. L. R. B. v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284. In *Moore Dry Dock Co.*, 92 NLRB 547, 549 (1959) the Board attempted to strike a balance by permitting the union to picket at the common situs but requiring it to make every reasonable effort to limit the inherent inducements and restraints of its picket line to the

primary employer and to minimize the impact on the neutrals:

> In the kind of situation that exists in this case, we believe that picketing * * * is primary if it meets the following conditions: (a) The picketing is strictly limited to times when the situs of the dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the *situs*; (c) the picketing is limited to places reasonably close to the location of the *situs*; and (d) the picketing discloses clearly that the dispute is with the primary employer. (Emphasis in original.)

The last two criteria were clearly met: the Union confined its picketing activities to the area surrounding the warehouse and stated on its signs that its dispute was solely with Cypress. Moreover, Cypress maintained a continuous presence at the warehouse during that period. The petitioner contends that Cypress was not engaged in its normal business operations at the situs of the picketing because no Cypress employees appeared at the warehouse throughout the course of the picketing to make deliveries, and therefore that the Union did not comply with the second requirement.

The determination whether an employer is engaging in normal business activities at a common situs even though none of its employees are present "depends in significant part on the reasons for this absence." Brownfield Electric, Inc., 145 NLRB 1163 (1964), and cases cited *supra*. Here the Cypress storage at the Auburndale warehouse did not require the continued presence of Cypress employees, since, although they delivered

additional concentrate to the warehouse for storage, and occasionally returned crates of concentrate to the Cypress plant for repackaging before shipment to the customer, the usual storage and shipment process continued whether or not they were present at the situs. In these circumstances, the Board properly found that Cypress was engaged in its normal business operations at the warehouse during the picketing, and that the Union picketed the warehouse for the primary object of disrupting those operations.

Here where the primary employer's operation is carried on not only at his own plant but also at a neutral employer's premises, the union must be permitted to appeal to those employees at the latter site who are performing work intimately connected with the struck employer's normal business operations. *See, e. g.,* United Steelworkers of America, AFL–CIO (Carrier Corp.) v. N. L. R. B., 1964, 376 U.S. 492, 499–500, 84 S.Ct. 899, 11 L.Ed.2d 863, in which the Supreme Court held that the union could permissibly appeal to employees of a neutral common carrier on the carrier's own premises because it was furnishing day-to-day service essential to the primary employer's regular operations. See also, International Brotherhood of Electrical Workers, Local 480 v. N. L. R. B. (Gulf Coast Bldg. & Supply Co.), 1969, 134 U.S.App.D.C. 178, 413 F.2d 1085, 1090, n. 7.

"The essential factor which renders the analysis in *General Electric*[1] and *Carrier* applicable to Auburndale * * * is the integral relationship of the particular facility picketed to the operations of the struck employer. * * *" Samoff for and on Behalf of NLRB v. Local 8–732, Oil, Chemical & Atomic Workers, D.C.Del.1969, 307 F.Supp. 434, 439.[2]

---

1. Local 761, International Union of Electrical Workers v. N. L. R. B., 1961, 366 U.S. 667, 81 S.Ct. 1285, 6 L.Ed.2d 592.

2. In Samoff for and on Behalf of NLRB v. Local 8–732, Oil, Chemical & Atomic Workers, D.C.Del.1969, 307 F.Supp. 434, the facts were "quite similar" to the facts in the instant case. The court relied on the *Auburndale* decision

in denying the Regional Director's request for an injunction pending determination whether picketing at a warehouse was unfair labor practice committed against the warehouseman. The court found, as the Board did here, that the secondary employer's warehousing of the primary employer's products was "an integral and substan-

I would hold that the Board properly determined that to the extent the Union was directing its appeal to common carrier employees arriving at the warehouse, the appeal constituted legitimate primary activity within the meaning of the Act.

tial part of the [primary employer's] operations * * *. [T]here is a substantial, integral relationship between the operations of Avisun [the primary employer] and Industrial [the owner of the warehouse]."