George **SQUILLACOTE**, Regional Director of the Thirtieth Region of the National Labor Relations Board, for and on Behalf of the **NATIONAL LABOR RELATIONS BOARD**, Petitioner,

v.

**LODGES 516 AND 2064, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, and District 10, International Association of Machinists and Aerospace Workers, AFL–CIO, Respondents.**

No. 78–C–625.

United States District Court, E. D. Wisconsin.

Oct. 31, 1978.

Stephen G. Katz, Milwaukee, Wis., for petitioner.

Goldberg, Previant & Uelmen, Matthew R. Robbins and Robert E. Gratz, Milwaukee, Wis. (Kenneth W. Black, Des Plaines, Ill., of counsel), for respondents.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

The petitioner has moved for an injunction pursuant to 10($l$) of the National Labor Relations Act, as amended, 29 U.S.C. § 160($l$), to enjoin the respondents' picketing and other conduct in support of an alleged unlawful secondary boycott pending final disposition of the labor controversy pending before the National Labor Relations Board (Board) between the respondent unions and Kelvinator Commercial Products, Inc. The motion will be granted.

The primary labor dispute is between the respondent unions and Kelvinator. The claimed secondary boycott is allegedly directed against Warehouse Terminal, Inc. (Warehouse), a public warehouse company where Kelvinator leases space, and also against other customers of Warehouse and common carriers transporting goods to and from Warehouse. On August 18, 1978, the unions' pickets appeared at the Warehouse entrance used by vehicles seeking access to the buildings in which Kelvinator products

are stored. On August 29, 1978, Warehouse filed a charge with the Board claiming that the unions are engaging in a secondary boycott contrary to section 8(b)(4)(i) and (ii)(B), of the Act, 29 U.S.C. § 158(b)(4)(i) and (ii)(B). The instant petition followed.

The petitioner contends that he has reasonable cause to believe that the defendants have engaged in a secondary boycott and that injunctive relief is proper. The respondent unions contend that Warehouse is a primary picket site for Kelvinator employees because "struck work" is being performed at Warehouse's facilities and because such facilities are inextricably tied to the normal operations of the struck Kelvinator plant.

The petitioner argues that even if Warehouse is a common situs at which picketing may take place, the unions' picketing fails to conform with the guidelines set forth in *Sailors Union of the Pacific, AFL (Moore Dry Dock Company)*, 92 N.L.R.B. 547, 549.

The district court's function in a section 10(*l*) petition case was set forth in *Squillacote v. Graphic Arts International Union*, 513 F.2d 1017, 1021 (7th Cir. 1975):

"On a section 10(*l*) petition, the district court is not called upon to decide the merits of an 8(b)(4) charge. The Board does this. The district court guided by equitable principles determines instead whether the Board has reasonable cause to believe the defendant has violated section 8(b)(4) of the Act. If the court finds reasonable cause, it must grant whatever injunctive relief 'it deems just and proper.'"

With respect to factual matters, "the Regional Director faces a relatively insubstantial burden of proof" in a section 10(*l*) proceeding. *Squillacote v. Graphic Arts International Union*, 540 F.2d 853, 858 (7th Cir. 1976). The evidence need not establish a violation. *Madden v. Int'l Hod Carriers' Building and Construction Trades Council*, 277 F.2d 688, 692 (7th Cir.), cert. denied, 364 U.S. 863, 81 S.Ct. 105, 5 L.Ed.2d 86 (1960).

The major area of dispute is whether the primary employer, Kelvinator, has sufficient presence at Warehouse so that picketing at Warehouse is lawfully directed at the primary employer. The facts asserted in the parties' affidavits are not in dispute to a significant extent. The parties disagree, however, whether the facts establish a reasonable belief that a violation of section 8(b)(4) has occurred.

Kelvinator does not have significant storage facilities of its own. It rents space at Warehouse to store its raw materials and finished goods. Warehouse leases space to at least 6 other customers, but Kelvinator rents more space than any of the other customers and accounted for one-third of Warehouse's gross revenue in 1977.

Suppliers of raw materials for Kelvinator deliver directly to Warehouse. The raw materials are then loaded by Warehouse employees, at Kelvinator's expense, onto an independent transport company's trucks for delivery to Kelvinator. Periodically, a Kelvinator employee will pick up supplies at Warehouse. Each day, a Kelvinator official visits briefly at Warehouse with bills of lading for goods to be picked up for Kelvinator and for finished products to be delivered to purchasers. Kelvinator's finished products are transported to customers by independent common carriers.

When finished products come off the assembly line at Kelvinator's plant, defective goods are marked with red tags and transported along with the other goods to Warehouse because Kelvinator lacks space to store the defective goods. Each day, defective goods are returned to Kelvinator for repairs and then returned to Warehouse. At times, a crew of Kelvinator employees will be sent to Warehouse to do repairs or "rework" on units stored there or to pack a shipment in a special manner for overseas transport.

After the strike at Kelvinator began, the local union's president explained to Warehouse's president that the union wanted to picket at Warehouse "to publicize its dispute with Kelvinator" and that they did not wish to interfere with Warehouse's other

customers. Warehouse's president refused to allow the unions' pickets on Warehouse's property. Striking employees then appeared at the entrance to Warehouse's property which provides access to the area leased to Kelvinator. The transport company that had been delivering materials to Kelvinator from Warehouse refuses to cross the picket line, and therefore Kelvinator itself has made deliveries between Warehouse and Kelvinator's plant. At least one independent common carrier refused to cross the picket line on August 21, 1978, and several other carriers expressed their hesitancy to cross the picket line. Although no shipment of goods owned by anyone other than Kelvinator was prevented from crossing the picket line, the petitioner's affidavits state that trucks of several carriers have been stopped and drivers have been questioned by strikers. The operations of Warehouse have been disrupted because of the attention its officers have been forced to devote to the problem of the picketers.

The Board has not taken a firm position with regard to picketing of warehouses used by primary employers. See *United Steel Workers of America, AFL–CIO (Auburndale Freezer Corporation)*, 177 N.L.R.B. 791 (1969), vacated and remanded, 434 F.2d 1219 (5th Cir. 1970), cert. denied, 402 U.S. 1013, 91 S.Ct. 2188, 29 L.Ed.2d 435 (1971); on remand, 191 N.L.R.B. 1 (1971). Nevertheless, I find that the petitioner may have reasonable cause to believe that the respondents have unlawfully induced and encouraged employees of Warehouse and of the independent trucking companies transporting goods to and from Warehouse to refuse to transport or handle Kelvinator products and have threatened, coerced and restrained such persons for the purpose of forcing them to cease doing business with Kelvinator.

I am mindful that Kelvinator has significant dependence on Warehouse's facilities and that its operations frequently require employees to perform tasks at Warehouse. Nevertheless, I am unable, as was the court of appeals in *Auburndale*, to resolve the case "on strained or ephemeral extensions or constructions of *situs*, applied out of context." 434 F.2d at 1222. As the court there stated:

"The subsidiary question of situs may not obliterate the major question: On the undisputed facts, did the picketing at Auburndale violate the statute?" *Id.*

The sole dispute is with Kelvinator and the true situs of the dispute is at the Kelvinator plant, where picketing is proper. The record before me justifies a belief by the petitioner that the picketing activities of the unions have secondarily imposed upon the operations of Warehouse and several independent common carriers. Added to this is the policy against enmeshing a public warehouse operator in every labor dispute in which a substantial customer becomes involved.

I also find that issuance of a preliminary injunction would be just and proper. The respondents will be enjoined from picketing at Warehouse pending resolution of the charges before the Board except when Kelvinator employees are actually present and performing work at Warehouse. If the picketing which is not prohibited by this injunction fails to conform with the requirements of *Moore Dry Dock, supra*, the petitioner may seek modification of the injunction.

Therefore, IT IS ORDERED that the petitioner's motion for an injunction pursuant to section 10(*l*) of the National Labor Relations Act be and hereby is granted.

The respondents, their officers, representatives, agents, servants, employees, and all members and persons acting in concert or participation with them, pending the final disposition of the matters involved herein pending before the Board, are enjoined from picketing at or near Warehouse Terminal, Inc., except when employees of Kelvinator Commercial Products, Inc. are actually present and performing work on the premises of Warehouse Terminal, Inc.